360 F.2d 741
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Respondent,
v.
S & P NATIONAL CORPORATION, Smith-Palmer Machine
Corporation, Southwest International Corporation,
Defendants-Appellants, David M. Milton
and Ralph E. Still, Defendants.
 No. 424, Docket 30488.
 United States Court of Appeals Second Circuit.
 Argued May 3, 1966.
Decided May 10, 1966.
 
 Martin I. Shelton, New York City (Shea, Gallop, Climenko & Gould, New York City, Milton S. Gould, New York City, on the brief), for defendants-appellants.
 Richard V. Bandler, Asst. Regional Admr. (Philip A. Loomis, Jr., Gen. Counsel, Meyer Eisenberg, Sp. Counsel, David Myerson, Atty., Washington, D.C., Llewellyn P. Young, Regional Admr., Jerome H. Grossman, Atty., Ney York City, Securities and Exchange Commission, on the brief), for plaintiff-respondent.
 Before LUMBARD, Chief Judge, and MOORE and FEINBERG, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 This case raises the propriety of two orders fo the District Court for the Southern District of New York entered at the instance of the Securities and Exchange Commission ('SEC'). One order granted a preliminary injunction restraining the three appellant corporations, inter alia, in the operation of their business as investment companies, and appointed Leslie Kirsch as receiver and trustee; the other authorized Mr. Kirsch to sell certain stock owned by one of the appellants. The ultimate issue before the court is whether the district court judge committed error in granting the equitable relief sought. Subject to a modification of the orders designed to give the corporations flexibility in dealing with a tax problem discussed below, the orders appealed from are affirmed.
 
 I.
 
 2
 The significance and propriety of the orders under attack are best assayed after a complete recital of the background and time table of the litigation to date. Appellants, defendants below, are S & P National Corporation ('S&P'), Smith-Palmer Machine Corporation ('Smith-Palmer'), and Southwest International Corporation ('Southwest'). Southwest is a wholly owned subsidiary of Smith-Palmer, and Smith-Palmer is a wholly owned subsidiary of S$P. Southwest and S&P are Delaware corporations; Smith-Palmer is an Illinois corporation. S&P, at the top of the corporated ladder, is a publicy owned corporation with approximately six hundred stockholders. Additional defendants, but not appellants, are David M. Milton and Ralph E. Still, both of whom have allegedly been intimately involved in the affairs of the corporations, as more fully set forth below.
 
 
 3
 On February 21, 1966, plaintiff SEC commenced an action praying for injunctive relief and the appointment of a receiver or trustee of the books, records and assets of the corporate defendants. The complaint alleged many long-continued and willful violations of the Investment Company Act of 1940 ('the 1940 Act'), 15 U.S.C. 80a-1 et seq., and the Securities Exchange Act of 1934 ('the 1934 Act'), 15 U.S.C. 78a et seq. The first three counts of the complaint aver that the corporate defendants have been investment companies for many years within the meaning of the 1940 Act, have failed to register under that Act, and have transacted business in violation of section 7 thereof, 15 U.S.C. 80a-7.[1] Count IV alleges violations of the reporting requirements of the 1934 Act, and the rules and regulations thereunder. Defendant S&P or its predecessor has been required since 1946 to file periodic reports with the SEC, pursuant to section 15(d) of the 1934 Act, 15 U.S.C. 78o(d). Counts V through IX of the complaint allege derelictions by the individual defendants Milton and Still. This was not the first action brought by the SEC against some of these defendants. In March 1965, the SEC brought suit against S&P and various alleged officers and directors to compel S&P to file annual and semi-annual reports which were up to two years overdue. In June 1965, the SEC obtained a mandatory injunction granting the relief sought, and in August 1965, a contempt order directing S&P to comply with the 1934 Act.[2] The reports were filed thereafter.
 
 
 4
 In this action, by notice of motion, dated March 9, 1966 and returnable March 22, 1966, the SEC sought a preliminary injunction and appointment of a receiver. On March 11, 1966, while the SEC's motion was pending and prior to any stipulation of adjournment of the motion, Paul O. Buckley, a stockholder of S&P, filed a petition in the Delaware state courts.[3] The papers in that action referred to the SEC complaint in the court below and sought, inter alia, prompt election of directors under Delaware law, with a view towards liquidation of S&P assets and termination of its corporate existence.[4] It appears from the record in the court below that Buckley acquired his interest in S&P most recently and is a long-time associate of defendant Milton and others who, according to the complaint, have secretly exercised control over S& P for many years.[5] The SEC's motion below for a preliminary injunction and appointment of a receiver was adjourned by stipulation, dated March 21, 1966, until April 12, 1966. As part of the stipulation, the corporate defendants agreed to maintain the status quo with respect to corporate assets and other matters pending the lower court's determination of the SEC motion.
 
 
 5
 Prior to the adjourned return day of that motion, however, the corporations sought permission to sell 479,730 shares of stock of Great American Industries, Inc. ('GAI') owned by Southwest, the entity at the bottom of the corporate ladder. The shares are traded on the American Stock Exchange, and the market in the stock has been volatile. On January 31, 1966, the closing price of GAI was $2 3/4 per share; on February 28, 1966, $7 1/8 per share; and on March 30, 1966, $12 3/8 per share. Appellants' motion eventually came before Judge Murphy, who denied it on April 4, 1966, but advanced the return day of the SEC's motion from April 12 to April 8, 1966. A further hearing was held on April 6 at the request of appellants, who advised the court that they could not complete their papers in opposition to the SEC's motion until April 12. Accordingly, Judge Murphy reset the time of hearing on that motion for April 12. At the April 6 hearing, appellants also advised the court that a notice of annual meeting to the shareholders of S&P had been sent out, the meeting to be held in Dover, Delaware on April 12, 1966.
 
 
 6
 The meeting, indeed, took place on Arpil 12, shortly before argument of the SEC motion for issuance of a preliminary injunction and appointment of a receiver. At the meeting, which was the first meeting of stockholders held in eleven years,[6] five directors and three officers were elected, including defendant Still in both categories. After hearing argument on April 12, Judge Murphy, in a fourteen-page opinion and order, dated April 16, 1966, granted the relief sought by the SEC. The order, inter alia, enjoined the corporate defendants, pending final hearing and determination of the SEC action, from selling or acquiring securities, engaging in business in interstate commerce or disposing of any of the assets of the companies; pursuant to section 42(e) of the 1940 Act, 15 U.S.C. 80a-41(e), and the court's inherent equity power, it also appointed a receiver and trustee of the corporations. The court amended its April 16 order by an order, dated April 20, clarifying the powers of the receiver and restraining defendant corporations from taking any action tending to interfere with the jurisdiction of the court below except appropriate review in this court. The April 16 opinion and order, as amended, is one of the two orders under attack by appellants.
 
 
 7
 Shortly thereafter, the receiver sought permission from the court to sell the GAI stock because of its meteoric rise in an uncertain market. The receiver advised the court that after some effort he had been able to secure from the SEC a 'no-action letter'[7] on the representation that he did not exercise any control or controlling influence over GAI and had no intention of doing so. On April 21, 1966, Judge Murphy authorized the receiver, in his discretion, to sell the GAI stock on the open market or at private sale. Appellants unsuccessfully urged the judge to insert certain provisions in the order, principally one allowing the corporations to adopt plans of liquidation conforming to the requirements of the Internal Revenue Code so that the tax impact of the GAI stock sale could be minimized. The order of April 21, 1966 is the second order appellants attack. Appellants appealed promptly from both orders and, on April 27, 1966, moved in this court for a stay of the April 16 order pending the appeal. The motion was returnable on May 2, at which time, in response to this court's suggestion, argument of the appeal from both orders on the merits was advanced to May 3, on the papers filed here on the motion for a stay, and on the briefs and record below.
 
 II.
 
 8
 Although a welter of issues emerge from the record below, it is helpful to recall that the questions on appeal are whether the court below made erroneous findings of fact, misconstrued or misapplied the law, or abused its discretion in (1) granting the injunction; (2) appointing a receiver; and (3) rejecting the conditions sought by appellants on the sale of GAI stock.
 
 Issuance of an injunction
 
 9
 The court below concluded that a prima facie case had been made that at least from 1957, the three corporate defendants were investment companies within the meaning of the 1940 Act. It is not disputed by appellants that the status of the three corporations is judged together because the lower two on the corporate ladder are each wholly owned by a parent. Section 3 of the 1940 Act defines an investment company and provides:
 
 
 10
 (a) When used in this subchapter, 'investment company' means any issuer which--
 
 
 11
 (1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;
 
 
 12
 (2) is engaged or proposes to engage in the business of issuing faceamount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or
 
 
 13
 (3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. As used in this section, 'investment securities' includes all securities except (a) Government securities, (b) securities issued by employees' securities companies, and (c) securities issued by majority-owned subsidiaries of the owner which are not investment companies.
 
 
 14
 Judge Murphy found that for the fiscal years ending November 30, 1958 to and including November 30, 1962, Southwest had been engaged in the business of owning securities 'having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.' The actual percentages in those years, according to the record, fluctuated from 68.3 per cent to 57.9 per cent. Appellants do not seriously dispute this but argue that the percentages fell below the forty per cent statutory requirement in the two later years and, in any event, Southwest was not primarily engaged in the business of investing.
 
 
 15
 Appellants are correct, although barely so, that in 1963 and 1964 Southwest's securities did not exceed forty per cent of its assets. (The percentage dropped to 36.2 per cent in fiscal 1963 and 39.8 per cent in fiscal 1964.) This would be significant if appellants, although required to register in the five years prior to fiscal 1963, automatically changed their status due to the tempoary drop in the value of their securities in the two later years. However, once registered, an investment company can 'de-register' only upon an SEC finding that it has ceased to be an investment company and an SEC order which, for the protection of investors, 'may be made 80a-8(f); cf. 15 U.S.C. 80a-13(a)(4). The SEC urges that since an investment (4). The SEC urges that since an investment company long operating unlawfully should not be better off than one complying with the law, appellants did not lose this status with the drop in the market. The argument is persuasive but it is not necessary to lay down a broad general rule. Appellants were required to register for five years, dropped just under the forty per cent requirement in the two succeeding years, but went well over it again with the rise in the value of the GAI stock. Under the circumstances of this case, therefore, it is enough to hold that Judge Murphy was clearly justified in concluding that the forty per cent formula of section 3(a)(3), 15 U.S.C. 80a-3(a)(3), was satisfied and that appellants were investment companies.
 
 
 16
 In effect, section 3(a)(3) creates a presumption that a company is an investment company, which is refuted if a company demonstrates that it falls within one of the exceptions of the 1940 Act for companies that are essentially industrial corporations but have over forty per cent of their assets in marketable securities. Kerr, The Inadvertent Investment Company: Section 3(a) (3) of the Investment Company Act, 12 Stan. L.Rev. 29, 46 (1959); see Bessemer Sec. Co., 13 S.E.C. 281 (1943). Appellants argue that they do fall within the exception provided by section 3(b)(1) of the 1940 Act, 15 U.S.C. 80a-3(b)(1), which provides:
 
 
 17
 (b) Notwithstanding paragraph (3) of subsection (a) of this section, none of the following persons is an investment company within the meaning of this subchapter:
 
 
 18
 (1) Any issuer primarily engaged, directly or through a wholly-owned subsidiary or subsidiaries, in a business or business other than that of investing, reinvesting, owning, holding, or trading in securities.
 
 
 19
 Appellants argue that from November 1956 to May 1963, Southwest was primarily engaged in phases of the real estate business through Wellit Corporation, a wholly-owned subsidiary. On the latter date, Wellit sold its assests and has since remained dormant. Judge Murphy pointed out that Wellit's assests were sold for only $200,000, which 'represented but a small part of Southwest's total assets of nearly $2,500,000,'[8] and rejected the contention that the corporations fell within the exception. Appellants also argued that for the period from November 30, 1956 to December 1957, the corporations were primarily engaged in the real estate business through ownership of all of the voting securities of Kraftville Corporation. However, after September 1957, Kraftville was no longer a wholly-owned subsidiary of Southwest and, therefore, its activities could not bring into play the section 3(b)(1) exception. This argument of appellants, therefore, is a marginal one at best. We do not regard as erroneous Judge Murphy's findings that appellant corporations have been investment companies for many years.
 
 
 20
 Conceding that they never registered, appellants properly point out that it is not enough for the SEC to have shown that they were investment companies, but that it was necessary to prove that they had engaged in certain transactions prohibited to an unregistered investment company. The court below referred to a number of such transactions in which appellants had engaged, including, inter alia, (1) a sale by Southwest in 1958 of 85,000 shares of Sterling Precision common stock on the American Stock Exchange; (2) further sales of more than 85,000 shares of the stock of the same corporation from 1958 to 1961 through use of the mails; (3) a sale of promissory notes as part of a transaction which took place in Nassau, Bahamas involving interstate commerce; (4) a sale in December 1962 of Southwest's interest in the shares of another corporation, for which it received approximately $190,000; (5) banking transactions in Chicago in 1960 and 1962 in connection with renewal of certain loans secured by the shares of another corporation.
 
 
 21
 Appellants did not seriously dispute below or in this court the occurrence of these transactions; they unsuccessfully argued primarily, as already indicated, that the transactions were not improper because the corporations were not investment companies. Appellants also relied on another exception contained in section 7 of the 1940 Act, 15 U.S.C. 80a-7, which, after prohibiting unregistered investment companies from engaging in certain transactions, specifically states that:
 
 
 22
 The provisions of this subsection shall not apply to transactions of an investment company which are merely incidental to its dissloution.
 
 
 23
 Appellants claim that their activities since 1956 have all been steps incidental to their dissolution. While the court below did not expressly deal with this contention, its rejection implicit in the finding that appellants violated the 1940 Act was clearly justified on the record before it. It stretches credulity to suggest that 'transactions * * * which are merely incidental to * * * dissolution' could have stretched over eleven years especially when at no time did S&P disclose any intention to liquidate either to its shareholders or in its periodic reports to the SEC. While there is no doubt that appellants ardently desire dissolution now and may have temporarily been interested in dissolution in 1956, the findings of the court below were based upon status and transactions since 1956, and were justified on the record before it.
 
 
 24
 We therefore conclude that the record below amply supports the district court's preliminary determination that appellant corporations never registered as investment companies, engaged in transactions improper under section 7 of the 1940 Act for unregistered investment companies, and were, in fact, investment companies. Therefore, the court's conclusion that the corporations had violated the 1940 Act and were threatening to continue to do so was, on the record before it, correct. This of itself would have justified the entry of a preliminary injunction below. Thus, section 42(e) of the 1940 Act, 15 U.S.C. 80a-41(e), provides in part:
 
 
 25
 Whenever it shall appear to the Commission that any person has engaged or is about to engage in any act or practice constituting a violation of any provision of this subchapter, or of any rule, regulation, or order hereunder, it may in its discretion bring an action in the proper district court of the United States * * * to enjoin such acts or practices and to enforce compliance with this subchapter or any rule, regulation, or order hereunder. Upon a showing that such person has engaged or is about to engage in any such act or practice, a permanent or temporary injunction or decree or restraining order shall be granted without bond.
 
 
 26
 See SEC v. Keller Corp., 323 F.2d 397 (7th Cir. 1963); SEC v. Fiscal Fund, Inc., 48 F.Supp. 712, 714 (D.Del. 1943). However, the trial court went on to deal with further alleged violations of law, principally the charge that S&P has over a period of years also violated the 1934 Act by filing reports with the SEC which were false and misleading because it failed to list defendant Milton as a 'director' and 'parent' of S&P, and it listed persons as directors who were not directors.
 
 
 27
 As to this charge by the SEC, it is undisputed that S&P was required to file Form 10-K reports pursuant to section 15(d) of the 1934 Act and has shown marked reluctance in the past to make such filings.[9] In concluding that the charge had been sufficiently proved, the court below, inter alia, relied on the following matters in the record before it: In each Form 10-K S&P filed in the years 1957 to 1964, it reported that its directors were Fred Aberlin, John A. Bitterli and Paul Taylor. There had been no meeting of S&P's stockholders from 1955 until the hastily called meeting in Delaware on April 12, 1966. Yet, sometime prior to 1962, Aberlin, Bitterli and Taylor had all tendered their resignations as directors, to which office they had been elected in 1955, and Taylor stated that he had never attended a directors' meeting. Defendant Still has been closely associated with defendant Milton since 1932 and over a period of many years received 'suggestions' or 'recommendations' from Milton as to business decisions affecting the corporations, none of which he could remember having refused to follow. Director Aberlin stated in March 1965, during an SEC investigation, that he had never known who controlled the affairs of the company, but it was his understanding that Milton directed the company through Still. Although Milton denied that he had exercised any influence over the management or the policies of the corporations since December 1958, Still admitted that directions for control of S&P continued to come from a law firm which was in communication with Milton and, he believed, from Milton. In addition, an associate of Milton's stated to the SEC that it was his impression that Milton was the dominant personality in S&P apparently in the period from 1959 to 1962. In the face of Milton's denial of any influence after 1958, the court also had before it two letters of August 5, 1959, dealing with important S&P business which indicated that a blind carbon copy had been sent to Milton. Moreover, a bank memorandum in connection with a loan to Southwest, dated April 8, 1960, notes that 'I telephoned Mr. David Milton stating that we were calling the loan * * *. Shortly after our conversation Mr. Metz telephoned to say he was forwarding the interest * * *.'[10]
 
 
 28
 The court below characterized this record as 'far from conclusive' but nevertheless 'sufficient * * * to at least create a strong prima facie case' for the SEC.[11] Although it may be that on further evidence developed at a full hearing on the merits the inference as to control will disappear, on the record at this time we do not feel justified in reversing this finding as clearly erroneous. Having so found, the court below correctly concluded that the Form 10-K reports improperly neglected to list Milton as a person who controlled the policies of S&P. The evidence befor the court below also justified its finding that the three named directors had abandoned their duties. Hence, the district court's correlative finding that the reporting of these three persons as directors was misleading does not seem incorrect. This finding provides further support for the conclusion that S&P has violated the 1934 Act.
 
 
 29
 In addition to disputing the findings as to Milton's control and abandonment by the named directors, appellants argue that factual issues with respect to control have been presented which must initially be determined by the SEC under section 2(a)(9) of the 1940 Act, 15 U.S.C. 80a-2(a)(9). That section provides:
 
 
 30
 'Control' means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company.
 
 
 31
 Any person who owns beneficially, either directly or through one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not so own more than 25 per centum of the voting securities of any company shall be presumed not to control such company. A natural person shall be presumed not to be a controlled person within the meaning of this subchapter. Any such presumption may be rebutted by evidence, but except as hereinafter provided, shall continue until a determination to the contrary made by the Commission by order either on its own motion or on application by an interested person. If an application filed hereunder is not granted of denied by the Commission within sixty days after filing thereof, the determination sought by the application shall be deemed to have been temporarily granted pending final determination of the Commission thereon. The Commission, upon its own motion or upon application, may by order revoke or modify any order issued under this paragraph whenever it shall find that the determination embraced in such original order is no longer consistent with the facts.
 
 
 32
 In other words, appellants argue that the SEC has primary jurisdiction to determine whether Milton 'controlled' S&P which must be exercised before the court can do so, citing such cases as Great No. Ry. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922), and Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 576 (1952). These decisions did indicate that a court should defer in certain circumstances to the primary jurisdiction of an administrative agency on disputed questions of fact whose determination has been left to that agency. However, appellant's argument is misplaced. In finding 'control' by Milton and, therefore, false and misleading reports, the court below was dealing with the 1934 Act, which requires periodic reports. Rule 12b-2 issued under the 1934 Act defines 'control' as 'the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' This definition contains no provision for a primary SEC determination of this issue. Moreover, even if the definition of the 1940 Act were applicable, the SEC itself has decided that the type of issue before the court below does not have to be decided first by the SEC if a prima facie case for relief can be made out in the court. See Fundamental Investors, Inc., Investment Company Act Release No. 3596 (1962); cf. Goldstein v. Groesbeck, 142 F.2d 422, 154 A.L.R. 1285 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590 (1944).
 
 
 33
 Thus, an examination of the record and proceedings below discloses that on the issue of the propriety of the preliminary injunction, the court's findings of fact were not clearly erroneous, its application of the law was correct, and it did not abuse its discretion. Appellants argue that the injunction is too broad and should have been confined to preventing future violations of the 1940 Act. However, appellants have pointed out that the only real business of the corporations in the last few years has been the ownership of securities.[12] Therefore, the broad terms of the injunction have no practical effect except to prevent appellants from disposing or dealing with the securities or, for the time being, taking any steps to dissolve. Under these circumstances, at least until a resolution of all disputes on a final hearing, the injunction should be continued except for a modification discussed below.
 
 Appintment of a receiver
 
 34
 The sequence of events leading up to the appointment of a receiver is set forth in great detail above.[13] On the facts found by the court below, there can be no successful challenge to the power or jurisdiction of the court below to appoint a receiver. Thus, section 42(e) of the 1940 Act, 15 U.S.C. 80a-41(e), provides:
 
 
 35
 In any proceeding under this subsection to enforce compliance with section 80a-- 7 of this title, the court as a court of equity may, to the extent it deems necessary or appropriate, take exclusive jurisdiction and possession of the investment company or companies involved and the books, records, and assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, who with the approval of the court shall have power to dispose of any or all of such assets, subject to such terms and conditions as the court may prescribe.
 
 
 36
 While the 1934 Act does not contain a similar explicit provision for appointment of a trustee or receiver, 'there is little reason to doube that equitable power to do so exists.' See Lankenau v. Coggeshall & Hicks, 350 F.2d 61, 63 (2d Cir. 1965). However, appellants vigorously urge that, in any event, the district judge abused his discretion in appointing a receiver in this case.
 
 
 37
 In assessing the exercise by the court below of its discretion, the following factors should be considered: the long continued violations of both the 1934 and 1940 Acts prima facie established in the record; the lack of a shareholders' meeting for eleven years with the sudden emergence of new officers and directors on the very day of argument on the SEC's motion for a receiver; the two hasty attempts to dissolve the corporations after the SEC filed its suit in the court below (one by an interested stockholder in the state courts in Delaware, and the other by the insistent request of appellants to the court below that they be allowed to call a special meeting to adopt plans leading to dissolution); the connection between at least one and possibly more of the present officers and directors and those who have controlled the corporations over the past eleven years; the prior abandonment for all practical purposes of at least the publicly held corporation by those represented to be its directors; the three year lapse from 1962 to 1965 in the filing by S&P of any of its Form 10-K reports; the fact that the corporations for all practical purposes are not conducting any substantial business now except for the holding of securities; the possibility that dissolution might release liabilities for past violations of the 1940 Act; and the need to get correct information as quickly as possible to public stockholders of S&P not affiliated with the management group.
 
 
 38
 While we do not think that appointment of receivers should follow requests by the SEC as a matter of course, we cannot say the trial judge was unjustified in concluding that prior violations of the 1940 Act, false reports under the 1934 Act, and the absence of corporate management were sufficient reason for the appointment of a receiver. Lankenau v. Coggeshall & Hicks, supra; Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141 (2d Cir. 1964); SEC v. Keller Corp., 323 F.2d 397 (7th Cir. 1963); Los Angeles Trust Deed & Mortgage Exch. v. SEC, 285 F2d 162 (9th Cir. 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); SEC v. Fiscal Fund, Inc., 48 F.Supp. 712, 714 (D.Del.1943). If the only purpose of the receivership were to bring about a quick liquidation, we might feel otherwise; see Lankenau, supra; Los Angeles Trust, supra. But the primary purpose of the appointment was promptly to install a responsible officer of the court who could bring the companies into compliance with the law, 'ascertain the true state of affairs * * * and report thereon' to the court and public shareholders and preserve the corporate assets. Therefore, liquidation was not the purpose of the court's action; if anything, as set forth below, liquidation is temporarily hindered. Until such time as a more informed decision can be made as to the desirability of liquidation, the receivership should not be disturbed.
 
 
 39
 Conditions surrounding the sale of GAI stock
 
 
 40
 Appellants do not object to the sale of the GAI stock because it is obviously in the best interests of all concerned that the high market price be obtained before it may disappear.[14] However, appellants strongly urge that the April 21, 1966 order authorizing the sale should also have provided that: (1) the previous injunction be modified to allow the directors and stockholders of S&P, Smith-Palmer, and Southwest to adopt plans of liquidation conforming to the requirements of the Internal Revenue Code insofar as this is still possible; (2) the trustee be required to post a bond; and (3) further approval of the court be required for any sale on other than an organized market.
 
 
 41
 Appellants argue with conviction that unless proper steps are taken, large sums in unnecessary taxes may have to be paid. Without meaning to pass in any way on the accuracy of appellants' statements of the underlying facts or of the feasibility of their tax proposal based on these facts, we recite briefly appellants' argument that a tax saving can be effected: Appellants claim that the basis of the GAI stock in the hands of Southwest is low in comparison with its current fair market value, so that there would be a substantial gain realized on any sale. If Southwest sells this stock, it will have to pay a capital gains tax on the difference between its basis and the net profits of sale. If Southwest and then Smith-Palmer liquidate under section 332(a) of the Internal Revenue Code, there would be no additional tax on these liquidations into S&P. On the subsequent liquidation of S&P, however, its stockholders would presumably realize a capital gain on the difference between their basis for the S&P stock and the value of money and other property distributed to them in liquidation of S&P. In short, appellants raise the specter of two capital gains taxes, one at the corporate level due from Southwest, and one at the stockholder level payable by the S&P stockholders. Appellants urge that if Southwest distributes the GAI stock immediately (rather than the proceeds of its sale) to Smith-Palmer, and Smith-Palmer distributes the same stock to S&P in complete liquidation, these liquidations would remain tax-free under section 332(a) of the Internal Revenue Code. Next, S&P, then owning the stock, could adopt a plan of complete liquidation under section 337 of the Internal Revenue Code and thereafter itself sell the GAI stock. If this course is followed, appellants predict that no gain or loss would be recognized to S&P on the sale, although its stockholders would still pay a capital gains tax on the liquidation of S&P. According to appellants, the one capital gains tax their proposal purports to eliminate may amount to as much as $1 million.
 
 
 42
 The trustee has stated that he too would desire legitimately to avoid taxes. However, he pointed out to the court below that the nature of the market is such that any delay-- even a two-week delay required for the calling of corporate meetings to adopt plans of liquidation-- could be fatal. Appellants rejoin that they are not attempting to prevent sale of GAI stock in the meantime, but would like to see the benefits of liquidations preserved for any stock that may still be unsold by the time the plans are adopted. This seems a sensible approach, yet problems remain.
 
 
 43
 The SEC has noted that there may be substantial causes of action available to the corporations or their stockholders as a result of transactions entered into over the past years while appellant corporations were unregistered investment companies.[15] The SEC and the receiver also point out that appellants' plans proposed to the court below go much further than liquidation. Although appellants' tax counsel expressly represented to Judge Murphy that liquidation was sufficient for tax purposes and that dissolution of the corporations was not required,[16] the actual plan submitted proposes liquidation and dissolution.[17] In addition, tax counsel had advised the other parties and the court that in adopting a plan of liquidation, the shareholders could properly designate a trustee to hold any contingent claims the corporation might own.[18] Such a provision might have gone some distance toward allaying the SEC's and receiver's fears that plans of liquidation would destroy causes of action for prior illegal transactions. Yet the plan submitted makes no such provision, but instead gives the officers and directors complete power to 'dispose of any and all claims and assets * * *.'[19] These features of appellant's actual plan clealy disturbed the SEC, which questioned appellants' alleged tax motivation in view of the broad scope of their plan-- a breadth not required to accomplish the tax goal according to appellants' counsel's representations just the day before.[20] Finally, the trustee expressed concern that passing the GAI stock up through Smith-Palmer to S&P might create 'Deep Rock'[21] problems, which at this time he could not evaluate without further investigation into the corporations' past affairs.[22]
 
 
 44
 The issue raised of effecting a tax saving is a serious one and may involve a substantial sum of money, although, according to the trustee's statement in court, a considerable portion of the GAI stock has already been sold. On the other hand, the concern of the SEC that the public shareholders of S&P would be asked to proceed in the dark in adopting far reaching resolutions with possible conclusive legal effect is understandable. It seems to us that the parties below should be given an opportunity to resolve the matter with preservation to each of their essential interests. Accordingly, appellants' plea in this court that they at least be allowed to set in operation the procedural steps for holding special corporate meetings at some time in the future to adopt plans of liquidation should be granted, although the proposed resolutions and accompanying statements[23] should be carefully and narrowly drawn to meet the legitimate concerns of the SEC. Accordingly, the injunction below will be modified to that extent. During the necessary period between the sending of notice to public shareholders and the date of the meeting, the parties will have an opportunity to explore more fully whether plans of liquidation should be adopted in view of the possible disadvantages raised by the SEC and the receiver. Moreover, this may provide an opportunity to furnish information to S&P's public stockholders not affiliated with the insider group-- especially if the parties find that such information is required by law before the meeting may be held. We expressly point out that our modification of the orders below only permits appellants to take necessary steps to propose but not adopt appropriate plans. Any other action-- including specifically intercorporate transfers of the GAI stock and the taking of votes at stockholders' meetings-- may not be taken except upon further approval of the court below after an opportunity for the SEC and the receiver to be heard. We have considered the other objections to the April 21, 1966 order and regard the action of the court below in rejecting the conditions proposed by appellants as within its discretion.
 
 
 45
 Appellants raised other issues in the pleadings and papers below which they did not press with fervor; e.g., that the SEC was guilty of laches;[24] that the prior injunction proceeding in the court below bars counts IV-IX of the complaint.[25] We have considered these contentions and find them insufficient to justify setting aside the action of the court below. The orders below are affirmed, except that the injunction is modified as set forth above, and the case is remanded for further proceedings consistent with this opinion. It would be most advisable for the parties to expedite the proceedings below not only with respect to the tax problem already discussed but also, if necessary, for a final trial of the merits of the issues raised by the complaint, so that the preliminary injunction and receivership pending resolution of these issues may be as short-lived as possible.
 
 
 
 [1]
 Count I of the complaint deals with S & P, count II with Smith-Palmer, and count III with Southwest
 
 
 [2]
 SEC v. S & P Nat'l Corp., et al., 65 Civ. 844 (S.D.N.Y.1965)
 
 
 [3]
 In the Matter of S & P Nat'l Corp., Civil Action No. 2347, 1966, Court of Chancery, State of Delaware
 
 
 [4]
 See Affidavit of Paul O. Buckley, sworn to March 10, 1966, p. 2, para. 3, contained in Ex. II of Affidavit of David J. Myerson, sworn ot March 30, 1966
 
 
 [5]
 See Supplementary Affidavit of Louis M. Winer, sworn to March 24, 1966. Among his other relationships with the defendants, Buckley since 1957 has apparently owned approximately 25% Of the voting stock of Kraftville Corp., a majority-woned subsidiary of Southwest (para. 7a), and has borrowed money or securities from S&P or its subsidiaries (para. 7d.)
 
 
 [6]
 Opinion and Order below, dated April 16, 1966 (Opinion and Order), p. 7
 
 
 [7]
 An informal statement by a member of the SEC staff advising that no legal action based on the stock sale, as represented, would be recommended to the Commission. See generally 3 Loss, Securities Regulation 1894-96 (2d ed. 1961)
 
 
 [8]
 Opinion and Order, p. 4
 
 
 [9]
 See note 2 supra and accompanying text
 
 
 [10]
 Affidavit of Louis M. Winer, sworn to March 1, 1966, para. 23
 
 
 [11]
 Opinion and Order, p. 6
 
 
 [12]
 E.g., Motion for Stay Pending Appeal, para. 4
 
 
 [13]
 See pp. 743-744 supra
 
 
 [14]
 According to the information furnished at oral argument, the SEC has recently twice suspended trading of the stock, and it is not clear from the record whether suspension has been lifted and, if it has not, when it will be
 
 
 [15]
 E.g., 47(b) of the 1940 Act, 15 U.S.C. 80a-46(b) provides that contracts made in violation of any provision or rule under the Act shall be void. In addition to the transactions in violation of 7 of the 1940 Act, 15 U.S.C. 80a-7, found by the court below, the SEC alleged that at least four transactions violated 17, 15 U.S.C. 80a-17, which concerns the conduct of affiliated persons and underwriters. Complaint, para. 44. Compare Answer of Defendant Milton, para. 10
 
 
 [16]
 Transcript of Hearing Before Judge Murphy April 20-21, 1966 ('Transcript'), pp. 22, 24-25
 
 
 [17]
 Motion for Stay Pending Appeal, Ex. F
 
 
 [18]
 Transcript, p. 23
 
 
 [19]
 Motion for Stay Pending Appeal, Ex. F
 
 
 [20]
 Transcript, pp. 41-42, 62, 66-67
 
 
 [21]
 Under the 'Deep Rock' cases, insider claims to corporate assets are sometimes subordinated to other obligations during reorganization or liquidation as a matter of equity. See Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). See generally Baker & Cary, Corporations Cases and Materials 396-97 (3d ed. 1959). We, of course, express no opinion as to the applicability of this theory here
 
 
 [22]
 Transcript, pp. 63-66
 
 
 [23]
 Counsel for appellants stated below that no informational statement need be sent to the public shareholders prior to a vote on the plan. (Transcript, pp. 59-61.) If the SEC should disagree, we do not intend to foreclose it from bringing any necessary action to require appellants to supply such data
 
 
 [24]
 Defendants' Answer, Fifth Defense
 
 
 [25]
 Ibid., Fourth Defense