**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**MORGAN, HARRIS & SCOTT, LTD.,** Euro American Currency Corp., Harrison Prescott, Inc., and Earl R. Wilt, Defendants.

No. 79 Civ. 4313.

United States District Court, S. D. New York.

Sept. 26, 1979.

Michael R. Koblenz, Regional Counsel, New York City, for plaintiff; Martha L. Brecher, Eileen Reinhardt, New York City, of counsel.

Tucker & Globerman, New York City, for defendants.

MOTLEY, District Judge.

### FINDINGS OF FACT

On August 16, 1979, the Commodity Futures Trading Commission (Commission) filed with the court a complaint for a temporary restraining order, preliminary and permanent injunction, an order granting access to premises, books and records, the appointment of a receiver, and the issuance of a protective order *pendente lite*, naming as defendants MORGAN, HARRIS & SCOTT, LTD., EURO AMERICAN CURRENCY CORP., HARRISON PRESCOTT, INC., and EARL R. WILT. The complaint alleged violations of sections 4c(b) and 4c(c) of the Commodity Exchange Act, as amended (the Act) [7 U.S.C. § 6c(b) and 7 U.S.C.A. § 6c(c)] and section 32.11 of the Regulations promulgated thereunder [43 Fed.Reg. 16161 (Apr. 17, 1978)].

On August 17, 1979, a temporary restraining order, a protective order *pendente lite*, and an order granting access to the premises, books, records, and accounts were issued by this court. The temporary restraining order restrained defendants from 1) offering to enter into, entering into, or confirming the execution of any transactions which were, or were of the character of, commodity options, and 2) engaging in the solicitation or acceptance of orders for the purchase or sale of commodity options. The protective order *pendente lite* prohibited defendants from directly or indirectly 1) dissipating, concealing, or disposing of, in any manner, any assets, choses in action or other property of the defendants; such order did not preclude expenditures in the ordinary course of business by the corporate defendants, nor expenditures for ordinary and necessary living expenses by the individual defendant; and 2) destroying, mutilating, concealing, altering, or disposing of, in any manner, any or all of the books, records, documents, correspondence, brochures, manuals, obligations, or other property of the defendants.

The Commission is an independent regulatory agency of the United States Government which has been charged with the responsibility for administering and enforcing the provisions of the Act, [7 U.S.C. §§ 1 *et seq.*], and the Regulations promulgated thereunder [17 C.F.R. §§ 1 *et seq.*].

This court bases its findings of fact on the following evidence: the record of the hearing on the preliminary injunction, including the sealed portion of that record, the testimony of Peter Scott Shedden (Shedden), Philip D. Rix (Rix), Joseph Bush (Bush), and James Douberley (Douberley); plaintiff's exhibits 1–24 in evidence; the affidavit of Philip D. Rix filed in support of plaintiff's motion for a temporary restraining order, preliminary injunction, and ancillary relief (Rix affidavit); the declaration of Murray A. Wolkis (Wolkis); and the general ledger accounts of defendant MHS (Ledger). Most of the background facts set forth in various affidavits regarding the defendants are not disputed by them. Defendants, of course, dispute the claim that they have engaged in illegal activity of any kind and particularly dispute the claim that they have sold commodity options. They also vigorously oppose the issuance of an order which would freeze the personal assets of defendant Wilt. Parties have stipulated that the trial be consolidated with the hearing on the merits. The court now makes the following findings of fact and conclusions of law:

Morgan, Harris & Scott, Ltd., (MHS) is a New York corporation with offices at 59 John Street, New York, New York, and 1995 and 2691 East Oakland Boulevard, Fort Lauderdale, Florida. In August, 1978, MHS was incorporated in the State of New York for the express purpose of selling "options and all other manner of contracts respecting deferred deliveries of commodities" (Pl's Exh. 3). Since September, 1978, to the present, MHS has been engaged in the business of offering and accepting or-

ders and money from public customers for the purchase of contracts which purport to be for the "deferred delivery" of gold, silver, platinum, and copper (Shedden p. 4; Pl's Exhs. 1, 9, 10, 11, 12, 14, 15, 15a, 15b, 15c, 15d, 16, 17, 17a, 22). MHS was registered with the Commission as a Commodity Trading Advisor and Commodity Pool Operator, but is not currently registered with the Commission in any capacity (Pl's Exhs. 6, 6a; Rix Aff. p. 2).

Euro American Currency Corporation (EAC) is a New York corporation having its principal place of business at 59 John Street, New York, New York 10038 (Pl's Exh. 2). EAC was incorporated in the state of New York in November, 1978 to sell "deferred delivery currency contracts" to members of the public (Pl's Exh. 5; Shedden p. 44). Since at least March, 1979, EAC has been engaged in the business of offering and accepting orders and money from public customers for the purchase of contracts which purport to be for the "deferred delivery" of German Deutschemarks, Swiss Francs, Pounds Sterling, Japanese Yen, and Mexican Pesos (Pl's Exhs. 2, 18, 18a, 18b; Rix Aff. p. 3). EAC is not registered with the Commission in any capacity (Rix Aff. p. 3).

Harrison Prescott, Inc. (HP) is a New York corporation with offices at 59 John Street, New York, New York, and 1995 and 2691 East Oakland Park Boulevard, Fort Lauderdale, Florida. In November, 1978, HP was incorporated in the State of New York in order to sell "options and all other manner of contracts respecting deferred deliveries of commodities" (Pl's Exh. 4; Shedden p. 51). Since at least March, 1979, HP has been engaged in the business of offering and accepting orders and money from public customers for the purchase of contracts which purport to be for the "deferred delivery" and "spot-based delivery" of gold, silver, platinum and copper (Rix Aff. p. 3; Pl's Exh. 7, 17b, 17c).

Earl R. Wilt (Wilt) resides at 211 Thompson Street, New York, New York. Wilt is a controlling principal and officer of MHS, EAC, and HP (Pl's Exhs. 6, 6A; Shedden pp. 12, 20; Rix pp. 56–61). Wilt actively participated in the management of the corporations by leading sales meetings (Shedden p. 8), and determining commissions earned (Shedden p. 18). Wilt actively participated in the sale of "deferred delivery" contracts to the public by "closing" deals (Shedden pp. 7–8, 27–28), "rolling" clients into additional investments (Bush pp. 111–15) and sharing commissions with other salesmen (Shedden p. 7). Wilt was registered with the Commission as an associated person of a futures commission merchant, but his registration expired in June, 1979, and was not renewed (Rix Aff. p. 3).

*The MHS, EAC, and HP Contracts*

The MHS, EAC, and HP contracts are investment vehicles which purport to confer upon their purchasers the right, but not the obligation, to buy a specified quantity of bullion, coins, or currency at a pre-set price on a specified date in the future (Pl's Exhs. 1, 2, 7; Rix pp. 65–75).

To acquire the MHS, EAC, or HP contract, the purchaser tenders a fixed, nonrefundable transaction fee which MHS, EAC, and HP denominate variously as a "premium," "contango," "reservation," or "service" fee (Pl's Exhs. 1, 2, 7; Rix pp. 68–71). This transaction fee is the sum which the MHS, EAC, or HP customer sends to the firm in the form of a check (Pl's Exh. 8) or by means of a bank-wire (Douberley pp. 127, 134–35). Customers were not informed that these funds constituted a nonrefundable premium which provided no equity in the contract (Bush pp. 103–18; Douberley pp. 123–44).

For this transaction fee, the contract purchaser gains "control" (Bush p. 124; Douberley p. 106) of a specified commodity for a specified term (Pl's Exhs. 1, 2, 7; Rix pp. 68–69). At the end of the contract term, the purchaser has the right to tender the full purchase price of the contract, as was established at the outset of the transaction, and take delivery of the commodity. If the purchaser does not wish to take delivery, the contract entitles him to direct MHS, EAC or HP to liquidate the contract and remit to him the earned equity. If the

market price has remained the same or has dropped during the term of the contract, the purchaser may elect to take delivery of the commodity at the prevailing market price, which is tantamount to abandonment of the contract (Pl's Exhs. 1, 2, 7; Rix pp. 71–75).

The funds remitted by the purchaser at the outset of the transaction do not give the purchaser any equity in the underlying commodity. If a purchaser wishes to take delivery of the commodity, he must tender the full purchase price of the contract, a sum which does not include the transaction fee. If the purchaser elects to liquidate his contract, he does not realize a net profit on the transaction unless the value of the commodity at the time of liquidation exceeds its value at the time the contract was purchased by an amount greater than the transaction fee. If the purchaser elects to abandon the contract, the entire transaction fee is forfeited (Pl's Exhs. 1, 2, 7; Rix Aff. 8–11).

The MHS, EAC and HP investment vehicles limit the purchaser's risk of loss to the amount remitted as the "premium," "contango," "reservation," or "service" fee. There are no additional costs for storage or margin calls (Shedden p. 16; Pl's Exhs. 1, 2, 7).

The expert testimony introduced by plaintiff established that a commodity option is defined as the right, but not the obligation, to purchase a specified quantity of a specified commodity at a preset price for a specified term (Rix pp. 65–66). For this right, the option purchaser remits a nonrefundable transaction fee which is not applied to the purchase price of the commodity.

Expert testimony presented established that the purchase of an "actual" or physical commodity anticipates delivery of the physical commodity at some time in the future. Payment tendered for an "actual," whether lump-sum or by installment, constitutes equity in the commodity and is applied as a down-payment on the ultimate purchase price (Rix pp. 163–65).

*Offer and Sale of MHS, EAC, and HP Contracts*

Members of the public were solicited to purchase MHS, EAC, and HP "deferred delivery" and "spot-based delivery" contracts through a series of unsolicited "cold-canvass" telephone calls (Shedden p. 5; Bush pp. 103–04; Douberley p. 123). Names of potential investors were acquired from Dun and Bradstreet listings (Shedden p. 5).

Salesmen were provided with "canned" scripts and standard objections with which to solicit prospective investors (Shedden pp. 5–6).

Customers were told that the funds which they invested would enable them to "control" specified quantities of commodities for specified periods of time (Bush p. 106; Douberley p. 124). Customers were misled by oral representations and promotional literature as to the nature of the contract term and were informed that liquidation could be ordered at any time within the term of the contract (Bush pp. 106–07; Pl's Exhs. 1, 2, 7). Only if a customer chose to liquidate prior to expiration of the contract was he told by Wilt, or another salesman, that liquidation could not be effected until the expiration date (Bush p. 115).

MHS, EAC, and HP salesmen did not inform purchasers that there was a substantial risk of loss involved in the purchase of an MHS, EAC, or HP contract (Bush pp. 117–18; Douberley pp. 124–44) when, in fact, the risk was high due to the nature of the transaction fee. Customers were not informed that the funds which they remitted constituted a nonrefundable premium which provided no equity in the contract (Bush pp. 103–18; Douberley pp. 123–44).

Customers were misled as to the "commission" charged for their contracts, the actual cost of the contract, the method by which profits and losses were to be calculated, and the probability of earning substantial profits (Bush pp. 106–07; Douberley pp. 124–44).

Customers were exhorted to bank-wire funds immediately to insure that the contract would be purchased at the price quot-

ed over the telephone (Bush pp. 105–06, 109; Douberley p. 127) and were provided with temporary account numbers as soon as they had agreed to remit funds to the firm (Bush p. 108; Douberley p. 127; Pl's Exh. 8). If initial funds could not be wired, a courier was dispatched to pick up the personal check of the customer (Bush p. 109).

After a customer wired or otherwise furnished funds to MHS, EAC, or HP a "confirmation" and "verification" was sent which detailed, among other things, the "purchase price" and "purchase date" of the contract (Pl's Exhs. 9, 10, 11, 17, 17a, 17b, 17c, 17d, 18, 18a, 18b). The "purchase date" reflected on the "confirmation" and "verification" did not conform to the date funds had been furnished to the company (Bush pp. 109–11; Douberley pp. 127–29, 132; Pl's Exhs. 8–12, 17, 17a, 17b, 17c, 17d), and the "purchase price" was generally higher than that which had been quoted over the telephone (Douberley p. 132). Although the contract was solicited by an MHS salesman, "verifications" were received by customers bearing the names of MHS, EAC, or HP to confirm the purchase (Douberley pp. 124–44; Pl's Exhs. 15, 17).

If the market price of the underlying commodity was rising during the term of the contract, salesmen including Wilt, placed frequent, often daily, calls to exhort the purchaser to invest in other, more costly contracts rather than to take out their profits (Bush pp. 103–22; Douberley pp. 124–44).

Although the "verifications" issued by MHS, EAC, and HP contained a "cancellation clause" which purported to enable the purchaser to cancel the investment and receive back funds previously remitted, the clause was unenforceable for it contained a one-day time limitation which could not possibly be met by an out-of-state customer (Douberley pp. 140–41; Pl's Exh. 18).

Based upon the unverified records of MHS and adjustments performed by Murray A. Wolkis, an auditor employed by the Commission, a tentative estimate is that MHS received income of $2,401,183.06, an indeterminate amount of which may be traced to the sale of option contracts to the public (Wolkis pp. 2, 4–5). Based upon these records and adjustments, it is also tentatively estimated that MHS had total expenses of $2,316,382.83 and a net profit of $84,800.23 (Wolkis p. 2). However, it should be stressed that these estimates are extremely tentative, since the records of MHS reflected numerous inaccuracies. Because of these inaccuracies, Mr. Wolkis could not establish with certainty that the entire income of MHS was derived from the sale of option contracts (although no other sources of income are readily apparent).

During the September, 1978 to July, 1979, period, it is estimated that approximately $102,989.00 was disbursed to Wilt, persons sharing Wilt's last name, and persons or entities which may represent personal interests of Wilt (Pl's Exhs., 22, 24; Rix pp. 75–77, 89, 153, 155, 156). For the reasons stated above, this estimate is also extremely tentative, and further investigation may reveal that Wilt received more than that amount.

## CONCLUSIONS OF LAW

In 1974, Congress amended the Commodity Exchange Act 7 U.S.C. §§ 1 et seq., granting the Commodity Futures Trading Commission broad authority to determine whether option transactions on certain commodities should be prohibited. In particular, the Act was amended to provide in section 4c, 7 U.S.C. § 6c(b), that

> [n]o person shall offer to enter into, enter into, or confirm the execution of, any transaction . . . which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe
>
> . . . .

In 1978, in light of the pervasive fraud in the industry, the Commission adopted Rule 32.11, 43 Fed.Reg. 16161 (Apr. 17, 1978),

suspending the offer of most commodity options in the United States.[1] Rule 32.11 provides that

> It shall be unlawful on and after June 1, 1978, until further rule, regulation or order of the Commission, for any person to solicit or accept orders for, or to accept money, securities or property in connection with, the purchase or sale of any commodity option, or to supervise any person or persons so engaged.

Congress added section 4c(c) to the Act in 1978, which prohibits all trading in options except sales to "a producer, processor, commercial user of, or a merchant handling, the commodity involved in the transaction, or the products or byproducts thereof." Futures Trading Act of 1978, Pub.L. 95–405, 92 Stat. 865 (1978). Thus, except where the Commission has granted an exemption, the offer or sale of commodity options is barred by both section 4c(c) of the Act and Rule 32.11, which was enacted under section 4c(b) of the Act.

Accordingly, defendants could not have lawfully engaged in commodity option transactions subsequent to June 1, 1978, the effective date of Rule 32.11.[2] It is undisputed that defendants were not properly registered with the Commission as option dealers, nor have they applied for an exemption from the Act's prohibition of option transactions. The critical issue is whether the "deferred delivery" contracts offered and sold by MHS, EAC and HP and the "spot-based delivery" contract offered and sold by HP constitute commodity options proscribed by Rule 32.11 and section 4c(c).

 While neither the Act nor the Commission's regulations offer a definition of the term commodity option, courts have formulated a definition: a commodity option is "a contractual right to buy, or sell, a commodity or commodity future by some specific date at a specified, fixed price." *British American Commodity Options Corp.*

*v. Bagley*, 552 F.2d 482, 484–85 (2d Cir., cert. denied, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *accord, Commodity Futures Trading Commission v. U. S. Metals Depository Co.*, 468 F.Supp. 1149 (S.D.N.Y. 1979); *Commodity Futures Trading Commission v. Crown Colony Commodity Options, Ltd.*, 434 F.Supp. 911, 914 (S.D.N.Y. 1977). A commodity option is to be distinguished from a commodity futures contract, which is "a contractual undertaking, which can be transferred to third parties, to buy or sell a fixed amount and grade of a certain commodity on some specified date." *Commodity Futures Trading Commission v. Crown Colony Commodity Options, Ltd., supra*, 434 F.Supp. at 913–14.

In *Commodity Futures Trading Commission v. U. S. Metals Depository Co., supra*, 468 F.Supp. at 1155, the court detailed the distinctions between options and futures contracts/margin sales:

> (1) the initial charge for an option, sometimes called a "contango fee," is a nonrefundable premium covering the seller's commission and costs, in contrast to the "down payment" paid in a futures contract or a margin sale, which is applied against the ultimate sale price; (2) the option contract gives the purchaser the right to take physical possession of the commodity but does not obligate him to do so, as a futures or margin contract would (3) a profit in an option contract accrues only if the price of the commodity rises enough to cover the contango fee (but losses are limited to the contango fee), while the futures or margin buyer profits if the sale price of his right to future delivery exceeds the purchase price (and suffers a loss if the former price is less than the latter price).

In fact, the court in *U. S. Metals Depository* found that the "deferred delivery" contracts—which were quite similar to the MHS, EAC, and HP contracts in the case at hand—constituted commodity options.

---

1. Several courts have upheld the validity of the Rule. *See, e. g., Rosenthal v. Bagley*, 450 F.Supp. 1120 (N.D.Ill.1978), *appeal pending*, No. 78–1647 (7th Cir.).

2. Section 4c(c) prohibited commodity option transactions effective October 1, 1978.

■ The "deferred delivery" contracts offered and sold by MHS, EAC, and HP appear to be commodity options when viewed in light of the three factors set forth in *U. S. Metals Depository*. First, the purchaser in an MHS, EAC, or HP contract pays a one-time fixed fee that constitutes the entire amount the purchaser puts at risk in the transaction. *See British American Commodity Options Corp. v. Bagley, supra,* 552 F.2d at 485; *Commodity Futures Trading Commission v. U. S. Metals Depository Co., supra,* 468 F.Supp. at 1155.

Second, the MHS, EAC, and HP contracts do not obligate the customers to take physical possession of the commodity. The contracts simply allow purchasers, for a limited period of time, to take a position on the change in market value of a specified amount of a specified commodity—the purchaser is not obligated to buy or to sell that commodity.

Third, it is only when the price of the commodity underlying the MHS, EAC, or HP contract rises sufficiently to equal the premium of the contract that the purchaser begins to accrue profits. If the price of the underlying commodity fails to move in the direction anticipated by its purchaser, the purchaser may simply abandon the transaction and suffers only the loss of his purchase price. If the price of the underlying commodity moves in the direction anticipated by the purchaser, but not by an amount sufficient to equal the premium, the purchaser may exercise the contract and recover a portion of the premium.

In these respects, the MHS, EAC, and HP contracts operate in the same manner as a "London" commodity option. *See generally British American Commodity Options Corp. v. Bagley, supra,* 552 F.2d at 484–85; *Commodity Futures Trading Commission v. U. S. Metals Depository Co., supra,* 468 F.Supp. at 1156; *Commodity Futures Trading Commission v. Crown Colony Commodity Options, Ltd., supra,* 434 F.Supp. at 914 n.6.

■ The self-serving labels that MHS, EAC, and HP choose to give their contracts should not deter the conclusion that their contracts are, as a matter of law, commodi-

ty options. The requirements of the Act and the Commission's rule cannot be avoided by a defendant who merely gives his illegal activities obfuscatory names. The Act and Rule 32.11 apply to commodity transactions "of the character of" commodity options, not just those called options by their offerors. *See* 7 U.S.C. § 2; 17 C.F.R. § 32.1. As the court in *Commodity Futures Trading Commission v. U. S. Metals Depository Co., supra,* 468 F.Supp. at 1154, noted,

The Court is not bound by the defendants' self-serving characterizations of their so-called "deferred delivery" contracts and the transactions engaged in, if in substance they were sales of options and not sales of bullion on margin for future delivery. Any thinly disguised and clearly calculated attempt to circumvent the congressional prohibition against option transactions aimed to protect the American public must yield to reality. "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." [ftn omitted].

■ In summary, the contracts offered and sold by MHS, EAC, and HP constituted commodity options. The offer and sale of these contracts, and the supervision by Wilt of persons engaged in the offer and sale of these contracts, violated sections 4c(b) and 4c(c) of the Act and Rule 32.11 insofar as the company dealt in prohibited options without obtaining an exemption from the Commission.

*Injunctive Relief*

■ Section 6c of the Act, 7 U.S.C. § 13a–1, provides that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted," against any "person [who] has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder." Unlike private injunctive actions, which require a showing of irreparable harm or the lack of an adequate remedy at law, statutory injunctive actions brought by the Commission

require merely that there is a reasonable likelihood of future violations of the law by the defendant. *Commodity Futures Trading Commission v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Commodity Futures Trading Commission v. British American Commodity Options Corp.*, 560 F.2d 135, 141–42 (2d Cir. 1977), *cert. denied*, 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1978); *Commodity Futures Trading Commission v. J. S. Love & Assocs. Options, Ltd.*, 422 F.Supp. 652, 661 (S.D.N.Y.1976); *see Securities and Exchange Commission v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972). Moreover, the likelihood of future violations of law can be inferred from defendants' past illegal conduct. *Id.* Whether such an inference should be drawn "depends on the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *Securities and Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).

Nothing in the case at hand, however, suggests that defendants' violation was an isolated occurrence. Rather, testimony demonstrated the continuous illegal offer and sale of commodity options by defendants since September, 1978. Furthermore, the record in this case suggests a systematic pattern of questionable conduct. As the court in *Commodity Futures Trading Commission v. U. S. Metals Depository Co., supra*, 468 F. Supp. at 1162, stated:

> The systematic past conduct of the company—the well-planned boiler room set-up, the calculated campaign of cold canvassing, the slanted and misleading brochures, the nonexistent performance bond, extravagant promises made by salespeople and encouraged by the company's management, and the patent illegality of the vehicle sold, together with the disingenuous attempt to cloak its true character—alone would warrant injunctive relief in this case. [footnote omitted].

■ The purported cessation by defendants of their illegal activity does not necessarily eliminate the likelihood of future violations. *Commodity Futures Trading Commission v. Crown Colony Commodity Options, Ltd., supra*, 434 F.Supp. at 919–20.

*Ancillary Relief*

■ As a general principle, "in an action brought to enforce the requirements of remedial statutes such as [the Commodity Exchange] Act, a district court has broad discretion to fashion appropriate relief." *Commodity Futures Trading Commission v. Muller*, 570 F.2d 1296, at 1300; *accord, Commodity Futures Trading Commission v. U. S. Metals Depository Co., supra*, at 1163. In the case at hand, ancillary relief is necessary to effectuate the statutory purpose and policy of the Act.

■ The Commission, in its prayer for relief, seeks the appointment of a receiver for corporate defendants MHS, EAC, and HP. Whether a receiver shall be appointed is a matter within the sound discretion of the court. *Securities and Exchange Commission v. R. J. Allen & Assocs.*, 386 F.Supp. 866, 878 (S.D.Fla.1974). The appointment of a receiver is appropriate where, as in this case, necessary to protect the public interest.[3] *Securities and Exchange Commission v. Bowler*, 427 F.2d 190, 198 (4th Cir. 1970). The appointment of a receiver is necessary to prevent diversion or waste of the corporate defendants' assets, to the detriment of those who have purchased the illegal commodity options. *See Securities and Exchange Commission v. R. J. Allen & Assocs., supra*, at 878. These assets may be necessary to make restitution or to protect those investors who hold currently open options. Moreover, a responsible officer of the court appointed as receiver may serve to investigate and "ascertain the true state of affairs" and report to the court. *See Securities and Exchange Commission v. S & P National Corp.*, 360 F.2d 741, 750–51 (2d Cir. 1966). In particular, a receiver in this

---

**3.** "[A]uthorities . . . do not limit the appointment of a receiver to cases where insol-vency is shown." *Securities and Exchange Commission v. Bowler, supra*, 427 F.2d at 198.

case should ascertain the extent to which the incomes of MHS, EAC, and HP are attributable to the offer and sale of commodity options, as the record remains unclear on this point.

In this case, the evidence demonstrated that Wilt owned, controlled, and managed and actively participated in the illegal sale of the option contracts. To allow Wilt to remain in control of the corporate defendants would not be in the public interest. In summary, while the disadvantages of the appointment of a receiver must be weighed against the considerations indicating a need for such relief, the court finds that the balance favors the appointment of a receiver.

■ The Commission also seeks a protective order to freeze temporarily the assets of the defendant. An order to freeze temporarily the assets of a defendant always requires careful consideration. For a corporate defendant, freezing assets might cause disruption of defendants' business affairs and, accordingly, threaten the very assets to be available for victims of the illegal actions. *See Securities and Exchange Commission v. Manor Nursing Centers, Inc., supra,* at 1105–06. For an individual defendant, freezing assets might cause serious personal hardship.

Nevertheless, an order to freeze temporarily the assets of a defendant is often necessary to ensure that the assets will be available to compensate public customers. *Commodity Futures Trading Commission v. Muller, supra,* at 1301; *Securities and Exchange Commission v. Manor Nursing Centers, Inc., supra,* at 1106; *Securities and Exchange Commission v. Scott, Gorman Municipals, Inc.,* 407 F.Supp. 1383, 1388 (S.D.N.Y.1975). Moreover, an order imposing a temporary freeze of assets is often necessary simply to preserve the status quo while an investigation is conducted to clarify the sources of various funds. *See Securities and Exchange Commission v. Manor Nursing Centers, Inc., supra,* at 1106.

A temporary freeze of assets seems appropriate given the facts of this case. MHS, EAC, and HP had over $2.4 million in income between September, 1978, and July, 1979, an indeterminate amount of which is attributable to the illegal sale of commodity options. An order imposing a freeze on Wilt's assets, in addition to those of the corporate defendants, is appropriate since at least $102,000 of corporate funds has already been distributed to Wilt, persons sharing Wilt's last name, and persons or entities which may represent personal interests of Wilt.

■ Defendants have advanced two objections to the order to freeze assets, as applied to Wilt. First, defendants argue that such orders are limited to cases where it has been shown that the party whose assets are to be frozen has been involved in the misappropriation of funds. In this case, defendants argue, no showing has been made that Wilt misappropriated customers' assets since all payments to Wilt are properly recorded in the corporation defendants' books as compensation or expense reimbursement. The court finds defendants' arguments to be without support. Nothing in the above-cited cases suggests that the appropriateness of orders to freeze temporarily assets is limited in any way to cases involving fraud or misappropriation. Such an order may be appropriate wherever necessary to ensure the preservation of funds for possible compensation to members of the public, regardless of whether the illegal activities involved misappropriation.

■ Second, defendants argue that an order imposing a temporary freeze of defendants' assets would be "tantamount to an order of attachment," and accordingly would be subject to Rule 64 of the Federal Rules of Civil Procedure and section 6201 of the Civil Practice Law and Rules of the State of New York (CPLR). Section 6201 provides that to obtain an order of attachment a showing must be made that a defendant "with intent to defraud his creditors has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." Contrary to defendants' argument, however, an order imposing a temporary freeze

in this case would not be tantamount to an order of attachment. CPLR § 6201 provides that "[a]n order of attachment may be granted in any action . . . where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants."[4]

In the case at hand, the plaintiff, the Commission, has not sought any form of relief which might be considered as "money damage." The order imposing a temporary freeze of assets is not designed to seize defendants' assets as security for an ultimate money judgment. Here the order is designed simply to preserve the status quo until the receiver is able to report on the financial assets and liabilities of defendants. A temporary freeze order will ensure that the court maintains jurisdiction over these assets, in order to allow the court the opportunity to determine later whether disgorgement of illegally acquired profits is appropriate. *See Commodities Futures Trading Commission v. Muller, supra*, at 1301; *Securities and Exchange Commission v. Manor Nursing Homes, Inc., supra* at 1106.

For the foregoing reasons the court finds that defendants MHS, EAC, HP and Wilt, by the offer and sale of commodity option contracts and the supervision of persons so engaged, from at least September, 1978, to August, 1979, have violated sections 4c(b) and 4c(c) of the Commodities Exchange Act and Rule 32.11 thereunder.

Accordingly, the relief requested by the government is granted, as described in the accompanying order.

---

4. CPLR § 105(p) defines a money judgment as "a judgment, or any part thereof, for a sum of money or directing the payment of a sum of money."