**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**U. S. METALS DEPOSITORY CO. a/k/a Metals Depository Corp. (a New York Corporation) and James Morse, William Rodman, Richard Keats, William Droge, Defendants.**

No. 79 Civil 1201.

United States District Court,
S. D. New York.

April 5, 1979.

Michael R. Koblenz, Regional Counsel, Michael S. Sackheim, Eric H. Vinson, Attys., Commodity Futures Trading Commission, New York City, for plaintiff.

James B. Zane, Stan A. Teitler, New York City, for defendants Metals Depository Corp. and Richard Keats.

Elliot H. Pollack, New York City, for defendant James Morse.

Morrow D. Mushkin, Brooklyn, N. Y., for defendant William Droge.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, the Commodity Futures Trading Commission ("CFTC" or the "Commission"), a regulatory agency established under the 1974 amendments to the Commodity Exchange Act (the "Act" or the "Commodity Act") to administer and enforce various provisions of the Act,[1] commenced this action for preliminary and permanent injunctive relief to restrain the defendants from engaging in practices asserted to be in violation of the Act and regulations promulgated thereunder.[2]

The defendant, Metals Depository Corp. ("Metals Depository" or "MDC"), a New York corporation with its principal place of

---

1. Commodity Futures Trading Commission Act of 1974, Pub.L.No. 93–463, § 101(a)(3), 88 Stat. 1389, *codified at* 7 U.S.C. § 4a, *amending* Commodity Exchange Act of 1936, ch. 545, 49 Stat. 1491. Future references to the "Commodity Act" will refer to the Commodity Exchange Act as amended. 7 U.S.C. §§ 1 *et seq.*

2. Commodity Act § 6c, 7 U.S.C. § 13a–1.

business at 880 Third Avenue in New York City, solicits and sells what it describes as contracts for "deferred delivery" of gold and silver to members of the public located throughout the United States. The individual defendants are Richard Keats, the President and chief executive officer of the company; William Rodman, MDC's Secretary-Treasurer; James Morse, the President of Quorum Communications, Inc., a marketing and sales consultant to MDC, with which it shares offices; and William Droge, a salesman and assistant sales manager for MDC. The Commission's complaint charges that since August 1978 the defendants have entered into, or aided and abetted one another and other persons in entering into, contracts which partake of the character of option transactions, in violation of the Commodity Act's prohibition of the sale of commodity options and of the antifraud regulations issued by the CFTC.

In 1974, Congress, greatly concerned by pervasive fraud in the commodity option industry, broadened regulation over option transactions and vested in the Commission plenary rulemaking powers.[3] The primary antifraud regulation promulgated under the CFTC's rulemaking authority is Rule 32.9:[4]

FRAUD IN CONNECTION WITH COMMODITY OPTION TRANSACTIONS.

It shall be unlawful for any person directly or indirectly—

(a) to cheat or defraud or attempt to cheat or defraud any other person;

(b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

(c) to deceive or attempt to deceive any other person by any means whatsoever; in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction.

The Rule has been interpreted in *pari materia* with Rule 10b–5 adopted by the Securities & Exchange Commission ("SEC") under the Securities Exchange Act of 1934[5] and, accordingly, has been applied to assure that the highest ethical standards prevail in every facet of the commodities industry.[6] A second antifraud regulation adopted by the CFTC is Rule 32.5, which requires that "prior to the entry into a commodity option transaction, each option customer or prospective option customer shall be furnished a summary disclosure statement by the person soliciting or accepting the order therefor,"[7] that these disclosures clearly describe the option being offered and prominently

---

**3.** Commodity Act § 8a(5), 7 U.S.C. § 12a(5) (authorizing CFTC "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of this [Act]"); *see id.* § 4c(b), 7 U.S.C. § 6c(b) (prohibiting options transactions that violate "any rule, regulation, or order of the Commission"); *British American Commodity Options Corp. v. Bagley,* 552 F.2d 482 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977) (broad rulemaking power of CFTC, including power to "ban option transactions altogether").

**4.** 17 C.F.R. § 32.9. This Rule is based on the antifraud mandate of § 4b of the Act, 7 U.S.C. § 6b, and has been applied by courts to evaluate the practices of option dealers. *See Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 77 Civ. 1822 (LPG) (S.D.N.Y. Aug. 31, 1978); *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 914–15 (S.D.N.Y.1977); *Commodity Futures Trading Comm'n v. J. S. Love & Assocs. Op-*

*tions, Ltd.,* 422 F.Supp. 652, 657–60 (S.D.N.Y. 1976).

**5.** Courts have consistently held that "case law developed under the securities laws is pertinent to cases under § 13a–1 of the [Commodity] Act." *Commodity Futures Trading Comm'n v. J. S. Love & Assocs. Options, Ltd.,* 422 F.Supp. 652, 661 (S.D.N.Y.1976); *accord, Commodity Futures Trading Comm'n v. Muller,* 570 F.2d 1296, 1299 n.6 (5th Cir. 1978); *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 77 Civ. 1822 (LPG) (S.D.N.Y. Aug. 31, 1978); *Kelley v. Carr,* 442 F.Supp. 346, 354 (W.D.Mich.1977) (citing cases).

**6.** *See SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186–87, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (quoted in *Commodity Futures Trading Comm'n v. J. S. Love & Assocs. Options, Ltd.,* 422 F.Supp. 652, 659 (S.D.N.Y. 1976)).

**7.** 17 C.F.R. § 32.5(a).

(in large capital letters at the beginning of the statement) inform investors of the risks of commodity investments,[8] and that within twenty-four hours of the transaction the seller should furnish the customer with a written confirmation statement.[9] A third provision, Rule 32.3, forbids commodity option trading by all persons except those "registered as a futures commission merchant under the Act and [whose] registration shall not have expired, been suspended . . . or revoked."[10]

The Commission determined in 1978 that these rules were not sufficient to regulate the sale of commodity options, because fraud in the industry was, as Congress had found earlier, still deeply entrenched and pervasive and posed substantial risks to the general public.[11] Thus it issued Rule 32.11, which made it unlawful after June 1, 1978 "for any person to solicit or accept orders for, or to accept money, securities or property in connection with, the purchase or sale of any commodity option, or to supervise any person or persons so engaged."[12] Congress, in amending the Commodity Act in 1978, confirmed the Commission's approach, codifying Rule 32.11 in section 4c(c) of the Act,[13] which prohibits all trading in options except sales to persons who in their regular business buy, sell, produce, or otherwise use

that commodity or sales by persons granted exemptions by the CFTC pursuant to its regulations.[14] Thus, unless exempted by the Commission, the offer or sale of any commodity option is proscribed both under the 1978 amendment of the Act and Rule 32.11.

To determine whether the Commission has sustained its claim that defendants violated these legal mandates, the Court conducted a hearing which extended over six days, during which the application for a preliminary injunction was consolidated with a trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. The witnesses included alleged victims of the company's sales campaign, employees and attorneys associated with MDC, defendant Droge, and an expert in the field of commodity options, Adelaide Blitzer.[15] Defendant Keats, called as a witness, exercised his constitutional right against self-incrimination and declined to answer questions material to the issues in the case. Upon a word-by-word review of trial transcripts, the Court's contemporaneous trial notes, an examination of the trial exhibits, and an evaluation of the demeanor of the witnesses, the Court is persuaded that the Commission has established its charges that

---

**8.** *Id.* § 32.5(a)(1)–(6).

**9.** *Id.* § 32.5(d).

**10.** *Id.* § 32.3(a). Rules 32.5 and 32.3 have been upheld by the Second Circuit as appropriate exercises of the CFTC's rulemaking authority, *see British American Commodity Options Corp. v. Bagley,* 552 F.2d 482 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977), and have been applied against violators, *see Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 560 F.2d 135 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977) (registration); *Kelley v. Carr,* 442 F.Supp. 346, 353–54 (W.D.Mich.1977) (disclosure).

**11.** 43 Fed.Reg. 16153, 16155 (Apr. 17, 1978).

**12.** Id. at 16161 *codified at* 17 C.F.R. § 32.11. The Rule was challenged and upheld in *Rosenthal v. Bagley,* 450 F.Supp. 1120 (N.D.Ill.1978), *appeal pending,* No. 78–1647 (7th Cir.).

Rule 32.11 did not, however, prohibit "trade options" allowed by Rule 32.4(a), 17 C.F.R. § 32.4(a); and the Commission subsequently issued Rule 32.12, 43 Fed.Reg. 23704, 23707–08 (Je. 1, 1978), which exempted "dealer options" if the grantor of the option and the futures commission merchant offering the option each met specified conditions.

**13.** Futures Trading Act of 1978, Pub.L.No. 95–405, § 3, 92 Stat. 865, *codified at* 7 U.S.C. § 6c(c).

**14.** *cf.* Commodity Act § 6c(d), 7 U.S.C. § 6c(d).

**15.** Blitzer, formerly employed as a commodities broker, is an auditor in the Enforcement Division of the CFTC and was qualified as an expert in the field of commodity options. *Cf. Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 77 Civ. 1822 (LPG) (S.D.N.Y. Aug. 31, 1978) (relying on expert testimony of Blitzer).

the defendants, singly and in concert with one another, violated the Act's prohibitions against trading in commodity options and the CFTC's antifraud regulations.

## I

It would be futile to contend that defendants could lawfully have engaged in commodity option transactions in the period at issue, August 1978 to the present. It is undisputed that the defendants were not properly registered with the CFTC as options dealers, and have not applied for a CFTC exemption from the Act's prohibition of option transactions.[16] MDC and other defendants argue, instead, that what they sold or offered for sale was not a commodity option but was an actual sale of gold or silver for "deferred delivery." The sale was, according to defendants, simply a leverage or margin transaction whereby the buyer pays a fraction of the purchase price to entitle him to future delivery of the specific commodity presently in existence.

In support of their position, defendants point to the oral representations of MDC salesmen and officers that customers were purchasing gold or silver for deferred delivery, the "gold certificates" allegedly issued by the Overseas Credit Bank (located in Luxembourg) to buyers guaranteeing their ownership of gold, and the fact that at least twenty-four ounces of gold were actually delivered through MDC.[17] They also rely on an opinion letter written to the company on January 31, 1979, by its counsel Boris Lewyckyj (the "Lewyckyj Letter"). The Letter describes the deferred delivery sale: the purchaser would pay a fee for the right to buy a certain amount of bullion for delivery 30, 90 or 180 days from the purchase date; MDC would thereupon place an order with the alleged Overseas Credit Bank to

purchase gold or silver to cover each sale; and the purchaser would either accept delivery or compel MDC to repurchase the bullion within the contract period. The Letter concluded that "cash sale for deferred delivery" was a leverage contract subject to regulation by the CFTC, but "since leverage contracts are not futures contracts nor are they options the firms dealing in those transactions are exempt" from the Commission's registration requirement.[18]

The Court has studied these documents and the testimony of the defense witnesses, including that of Lewyckyj, together with two exhibits that indicate the nature of the transaction—MDC's "Customer Agreement for the Purchase of Cash Gold or Silver Bullion for Delivery on a Date Certain" (the "Customer Agreement") and a brochure entitled "Gold: The True Currency of the World" (the "Gold Brochure"), both of which were distributed by MDC to its customers and prospective purchasers who were being solicited. The Court is not bound by the defendants' self-serving characterizations of their so-called "deferred delivery" contracts and the transactions engaged in, if in substance they were sales of options and not sales of bullion on margin for future delivery. Any thinly disguised and clearly calculated attempt to circumvent the congressional prohibition against option transactions aimed to protect the American public must yield to reality. "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."[19]

The inquiry must begin with the definition of "options." Although neither the Act nor the Commission's regulations

---

**16.** Trial Record ("T.R.") at 181 (registration), 246–48 (exemptions); cf. Savage v. Commodity Futures Trading Comm'n, 548 F.2d 192 (7th Cir. 1977) (high standards for CFTC grant of application to be registered commodity-trading advisors).

**17.** T.R. at 281–83, 399–401.

**18.** Exh. E at 9. The Letter, however, was based upon representations made to Lewyckyj by Richard Keats, T.R. at 328–30, some of which were misleading or untruthful, see id. at 345–64. See also id. at 332–33, 339–41 (Lewyckyj admitting possibility that Metals Depository was selling options).

**19.** Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935).

define the term, courts have often differentiated between options and deferred delivery (or futures) contracts. The latter is a transferable contractual agreement "to buy or sell a fixed amount and grade of a certain commodity on some specified date. A commodity option, on the other hand, confers upon the holder the right to buy ('call option') or to sell ('put option') either a specified amount of a commodity or a futures contract for that amount of a commodity within a certain period of time at a given price (the 'strike price')." [20] Functionally, options are distinguishable from futures contracts and margin sales in at least three significant respects: (1) the initial charge for an option, sometimes called a "contango fee," is a nonrefundable premium covering the seller's commission and costs, in contrast to the "down payment" paid in a futures contract or a margin sale, which is applied against the ultimate sale price; (2) the option contract gives the purchaser the right to take physical possession of the commodity but does not obligate him to do so, as a futures or margin contract would; (3) a profit in an option contract accrues only if the price of the commodity rises enough to cover the contango fee (but losses are limited to the contango fee), while the futures or margin buyer profits if the sale price of his right to future delivery exceeds the purchase price (and suffers a loss if the former price is less than the latter price). Since options are "limited risk" investments—the buyer is under no obligation to exercise his option and will, at most, lose the initial fee—they are attractive to unsophisticated investors; but options are subject to abuse because of their speculative nature and the tendency of sellers to downplay the "limited profit" aspect (the nonrefundable fee).[21] The Court finds that the investment sold by Metals Depository is a commodity option, since it has all three of the above characteristics that distinguish options from sales on margin.[22]

First, there can be no doubt that the premium paid by customers to MDC was a nonrefundable contango fee. Paragraph five of the Customer Agreement describes the "contract origination fee" as "the cost MDC charges for handling the entire transaction and providing all the services enumerated herein. This is a *nonrefundable one time charge* and irrevocable unless written notice is submitted to MDC within three (3) days of receipt date."[23] That this fee is not a down payment to be applied against the ultimate purchase price is confirmed by paragraph seven of the same document: "The term 'purchase value' shall be defined to mean the price the Customer must pay for the cash bullion in order to take delivery thereof. . . . *Purchase*

---

**20.** *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 913–14 (S.D.N.Y.1977). Similar definitions have been formulated by other courts, *e. g., SEC v. Commodity Options Int'l, Inc.,* 553 F.2d 628, 629–31 (9th Cir. 1977); *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 77 Civ. 1822 (LPG), slip op. at 8–9 (S.D.N.Y. Aug. 31, 1978); *Kelley v. Carr,* 442 F.Supp. 346, 348–49 (W.D.Mich.1977), and by Blitzer in her testimony at the trial in this case, *see* T.R. at 209.

**21.** 43 Fed.Reg. 16153, 16154 (Apr. 17, 1978) (CFTC investigation "reveals that most of the firms that offer and sell commodity options employ high pressure . . . sales practices" and exaggerate the profit potential to investors, without apprising them of great risks and nature of contango fee); *Kelley v. Carr,* 442 F.Supp. 346, 349 (W.D.Mich.1977):

It is evident that options are attractive to sellers in that capital requirements are minimal, and to buyers because costs are usually somewhat lower than purchasing a futures contract outright since the premium and initial broker's fees should run less than the margin requirements of the underlying contract, and investors can limit their potential losses. Owing to the ease of market entry, however, fly-by-night organizations are often attracted.

The potential for abuse in the field of option trading created a great deal of pressure for legislation outlawing fraudulent dealings in commodity options.

*See SEC v. Commodity Options Int'l, Inc.,* 553 F.2d 628, 630–31 (9th Cir. 1977) (citing to literature on abuses and speculation in "naked options").

**22.** *See* notes 20–21 *supra,* and the expert testimony of Blitzer, T.R. at 229.

**23.** Exh. 10 ¶ 5 (emphasis supplied).

*Value does not include Origination fee."* [24] This finding is also supported by the testimony of Blitzer and Droge and by the Lewyckyj Letter.[25]

Second, there was no true sale of bullion, because the customer was not obligated to take delivery. The Customer Agreement, to be sure, gave the buyer the right to delivery of specie upon payment of "good funds in an amount equal to the purchase value of the contract and any applicable taxes," [26] and there is evidence referred to above that two buyers requested and received delivery of gold. On the other hand, it appears that few buyers took advantage of this right because the Agreement required that the *full* purchase price be forwarded and because "[t]o take physical delivery of gold is difficult through a foreign bank to be delivered across the border. It's very complicated." [27] Most customers chose, instead, to exercise their right to "instruct and order MDC to liquidate the bullion position held in Customer's account . . . at the prevailing market rate.[28] In fact, the presumption embodied in the Customer Agreement was that customers would never receive the actual gold or silver: "In the event that neither instructions to make delivery nor instructions to liquidate are issued to MDC 14 days prior to delivery date, MDC will automatically order that the Customer's account be liquidated." [29]

Third, the transaction would not be profitable unless the rise in the price of gold or silver was greater than the "break even point," that is, the point at which the commodity's rise in price covered the contango fee. An example from the Gold Brochure is illustrative:

Q) What would happen if I purchased gold from you and within six months gold prices soar, but I did not wish to take delivery of the gold I ordered from you, what would your position be?

A) YOU ARE NOT FORCED TO TAKE DELIVERY OF YOUR BULLION OR COINS!
BY WAY OF ILLUSTRATION: JOHN DOE ORDERED 100 OUNCES OF GOLD. HIS PURCHASE PRICE WAS $182.50 PER OUNCE (100 OUNCES [at] $182.50 PER OUNCE = $18,250.00). GOLD PRICES INCREASE DURING A SIX MONTH PERIOD TO $270.00 PER OUNCE (100 OUNCES [at] $270.00 PER OUNCE = $27,000.00 PER 100 OUNCES). MR. DOE INFORMS US THAT HE DOES NOT WISH TO TAKE DELIVERY OF HIS ORDER, SO ON HIS BEHALF WE WILL LIQUIDATE HIS POSITION. HE WOULD THEN RECEIVE A CHECK FROM Metal Depository Corp. FOR $8,750.00. SINCE MR. DOE HAD PAID Metal Depositor[y] Corp. A CONTANGO FEE OF $4,500.00, MR. DOE WOULD REALIZE $4,250.00 PROFIT ON THE LIQUIDATION OF HIS CONTRACT.[30]

Thus if the price of gold had gone up to $202.50 per ounce at the time of liquidation, the investor would have sustained a net loss, since the check from MDC for $2000 would be less than half the original contango fee. Conversely, if the price of gold fell to $152.50 per ounce, the investor's loss would have been limited to the contango fee, since he was guaranteed that "[i]n no

24. *Id.* ¶ 7 (emphasis in original).

25. T.R. at 179, 233, 436; Exh. E at 2 ("Purchaser pays a contract origination fee, which is not a downpayment toward the purchase price, nor is it refundable unless certain conditions are met, as outlined in the contract. The contract origination fee covers all expenses incurred by MDC.")

26. Exh. 10 ¶ 10.

27. T.R. at 473; *see id.* at 466.

28. Exh. 10 ¶ 11.

29. *Id.* ¶ 12. *See also* T.R. at 180–81 (¶ 12 "further reinforces to [Blitzer] that this vehicle is an option, although it doesn't appear to be called that").

30. Exh. 2 (under "QUESTIONS YOU MAY WISH TO ASK").

event will Customer be liable for any additional funds beyond the Origination fee charged." [31]

 The evidence is abundant that MDC and its officers and agents were engaged in the sale of limited risk options, not the margin sale of gold or silver. It follows that defendants have violated section 4c(c) of the Commodity Act and CFTC Rule 32.-11, as the company dealt in prohibited options without obtaining an exemption from the Commission, and Rule 32.3 insofar as neither the company nor the individual defendants are registered with the CFTC. This finding alone would suffice to grant injunctive relief against the continued activities of the defendants. Additionally, the disclosure and antifraud provisions of Rules 32.5 and 32.9 are also applicable against defendants' conduct, and the Court must now evaluate the sales operation in the light of those Rules.

## II

The essence of the Commission's charges of fraudulent conduct is that MDC operated a high-pressure "boiler room" sales campaign in its efforts to sell commodity options by means of fraudulent or deceitful conduct unlawful under Rule 32.9.[32]

The genesis of MDC's options operations in the latter half of 1978 is not without significance, since much of the furniture and some of the personnel (including defendants Droge, Morse, and Rodman) came from J.M. King & Associates; a commodities operation enjoined from engaging in fraudulent practices in the sale of commodity futures and placed in receivership by consent order of this Court in late 1978.[33] There can be no doubt that these individuals and other agents of the company were experienced in commodities transactions and were aware of the law's requirements. Nonetheless, the physical layout of the offices at 880 Third Avenue resembles the classical boiler room, with desks lined up closely one behind another like "rows of corn," telephones connected to WATS lines for each desk, and eighty or more salespeople working in two shifts (forty-five working from 9:15 a. m. to 5:00 p. m. and thirty-five working from 5 p. m. to 10:30 p. m.) and making an estimated 16,000 telephone calls a week. The testimony supports a finding that there may have been over one million outgoing telephone calls to prospective customers over a six-month period.[34]

The training program for salespeople, run by defendant Morse and Larry Berman, outlined methods of "cold canvassing" [35] and stressed high-pressure sales techniques. The testimony to the Court was unspecific as to what information was imparted at the training sessions, but the MDC training

---

**31.** Exh. 10 ¶ 12.

**32.** "Boiler room" firms solicit customers to make purchases of securities or commodities by means of an intensive sales campaign conducted by numerous salespeople, who contact them through unsolicited mailings and telephone calls and then induce hasty decisions to buy the offering by means of high-pressure sales techniques that ignore the investment's suitability to the needs of the buyer and often fail to disclose material facts about the investment. *Cf. SEC v. R. J. Allen & Assocs.,* 386 F.Supp. 866, 874 (S.D.Fla.1974) (similar definition). The cases have uniformly held that such boiler room sales operations are prohibited under Rule 32.9. *See Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 77 Civ. 1822 (LPG) (S.D.N.Y. Aug. 31, 1978); *Kelley v. Carr,* 442 F.Supp. 346 (W.D.Mich.1977); *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911 (S.D.N.Y.1977).

**33.** In *Commodity Futures Trading Comm'n v. J. M. King & Assocs.,* 78 Civ. 4195 (EW) (S.D. N.Y. Oct. 3, 1978), the defendants, including James Morse, a defendant in this case, entered into a consent judgment granting the relief sought by the Commission—a broad injunction against commodities fraud by the defendants and the appointment of an equity receiver for the company.

**34.** T.R. at 495.

**35.** In a "cold canvass" campaign, "the salesman solicits potential investors to whom he has not been recommended and with whom he has had no previous contacts." *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 915 n. 14 (S.D.N.Y.1977).

manual distributed to and used by sales personnel reveals that the training slighted, if not completely ignored, professional standards of suitability and concentrated on methods of sales pressure.[36] The sales personnel, referred to as "account executives," received a "canned" script and were instructed to carry on an effective sales pitch to unwary prospective customers. Representative of the tone of the manual is its introductory trumpet: "THERE IS ONLY ONE WAY TO REACH THE TOP IN SELLING—YOU MUST UNDERSTAND HOW TO GIVE A GREAT PRESENTATION. . . . YOUR OBJECTIVE, HOWEVER, IS NOT TO MAKE AN ORDINARY PRESENTATION, BUT TO DEVELOP AND DELIVER A GREAT PRESENTATION THAT WILL . . . MAKE THE PROSPECT DECIDE THAT HE WANTS TO BUY NOW!"[37] The manual proceeds to discuss "ingredients of a great presentation," the advantage of leverage, the proper way to turn customer objections and questions to the advantage of the salesperson (including a sample set of objections and answers), and "some points to help close sales":

> BE ENTHUSIASTIC. ENTHUSIASM IS CONTAGIOUS.
> ASSUME THAT THE PROSPECT IS GOING TO BUY. GET HIM TO DECIDE ON A MINOR QUESTION, SUCH AS HOW DOES HE WANT THE ACCOUNT REGISTERED?
>
> . . . . .

> MAKE IT HARDER FOR THE PROSPECT TO SAY NO THAN YES. MAINTAIN A POSITIVE AND CONFIDENT ATTITUDE.
>
> . . . . .

> BE SURE TO OVERCOME THE FEAR OF YOUR PROSPECT THAT HIS MONEY MAY BE LOST OR THAT HE WILL NOT GET HIS MONEY'S WORTH. THE PROSPECT WILL BUY *IF* HE FEARS THAT UNLESS HE DOES HIS SAVINGS MAY LOSE IN VALUE, THAT HE MAY BE DEPENDENT UPON OTHERS, OR THAT HIS FAMILY WILL SUFFER.[38]

The evidence establishes that the cold canvass and high-pressure techniques indicated in the manual were used by MDC personnel. The names and telephone numbers of potential investors were purchased in bulk from those who compiled such lists from investor records; for example, one such purchase was from a firm that culled from available county records all individuals who had taken advantage of certain tax shelters during the previous year. The MDC salesperson would then try to make telephone contact with the names taken from these lists, sometimes making upwards of ten to fifteen unsolicited calls before getting through to the prospect. In the initial conversation with a potential customer, the salesperson would dominate the discussion by reading from the canned script.[39] The script indicates, and the oral

---

**36.** Exh. 25; *cf. Clark v. John Lamula Investors, Inc.*, 583 F.2d 594 (2d Cir. 1978) (duty under Rule 10b–5 for investment advisor not to recommend "unsuitable" investments); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (liability for recommending speculative and "junk" securities unsuitable for plaintiff's investment needs).

**37.** Exh. 25 (unpaginated).

**38.** *Id.*

**39.** Included in the training manual, *see* Exh. 25, and submitted as a separate Exh. 22, is a canned speech used by salespeople upon their initial conversations with potential customers. It is entitled "FIRST CALLS TO QUALIFY":

> Good morning/afternoon Mr. ——. How are you? My name is ——. I'm in the Gold department with Metals Depository Corp. in New York. (FIRST NAME) I know you're busy, but this will only take a moment ——— are you aware of what's happening to the price of Gold lately? (SHUT-UP AND LISTEN) If asked ——— (up from $165.00 to $—— per ounce and expected to reach 350 to 400 dollars per ounce within six months.) Our research department is putting together a Gold information report that will show you a gross profit of —— to —— thousand dollars on an investment of ONLY —— thousand within a six month period. What do you think of this kind of profit? (SHUT-UP AND LISTEN) Fine, I'll get a package out to you and call you back in about a week to see how you like it. Would you prefer I

testimony confirms, that the interest of prospective customers was stimulated by extravagant predictions that the price of gold would go up to "350 to 400 dollars per ounce within six months." It is crystal clear that the thrust of the script was to convey the distinct impression that extraordinary profits were all but certain to be realized. The misleading tone and predictions in the script were made without a reasonable belief in their accuracy.[40]

■ To follow up on the initial conversation, and maintain pressure on the prospect, the salesperson would frequently send a brochure ostensibly prepared by the "MDC Research Department" and entitled "MDC Special Situation Report on Gold."[41] The thesis of the pamphlet was that gold was an ideal investment in times of inflation and that special factors indicated that gold was on the rise. The brochure is materially misleading. First, it represents itself to be a scholarly product of a research department, when in fact MDC had no such department. Second, the pamphlet confident-

ly predicted that gold would reach $280 to $300 per ounce by mid–1979, over $350 per ounce by the end of 1979, $500 per ounce in 1980, and a golden plateau of $1000 per ounce by the mid–1980's. These astronomical projections are patently deceitful in encouraging wholly unrealistic expectations in the mind of the buyer.[42] Finally, notwithstanding the fine print secreted away at the bottom of the fourth page, conceding that the brochure "does not purport to be a complete statement of all material facts relating to commodities mentioned," the pamphlet is materially misleading in not stating the risks of investing in the highly speculative gold market: "Purchases of gold today, in our opinion, offer outstanding intermediate and long-term profit potentials for those investors who recognize the signs of the times, so to speak." The tenor and representations of the leaflet, like those of the script, clearly violate standards of professional investment advice.[43]

After the unsolicited initial call and mailing, the MDC agent would continue to press

send it to your home or your business? (VERIFY ADDRESS, ZIP CODE, CHECK SPELLING) What's the best time to reach you?
Incidentally (FIRST NAME), if you like what you read, and this kind of profit return, are you prepared to invest _____? (SHUT-UP AND LISTEN) Fine, study the package carefully when it arrives, jot down any questions and we'll discuss them next week—alright. Bye!
IF ANSWER IS YES TO ALL THREE QUESTIONS, YOU NOW HAVE A QUALIFIED FIRST CALL.
See also Exh. 23 (canned closing: "Now, we feel, and every major economist in the country feels that your gonna see GOLD back up to $250 to $270. an ounce within the next 60 days. That your gonna see it happen very quickly. . . . So we[']re suggesting that you handle as many 100 ounce positions at $2,450. each as you possibly can.")

**40.** See T.R. at 240 (Blitzer testimony that "with a metal as volatile as gold, it is absolutely impossible to predict . . . with any particular accuracy a specific price"). The rule in securities law, equally applicable to commodities transactions, is that the "dealer occupies a special relationship to a buyer of securities in that by his position he implicitly represents he has an adequate basis for the opinions he renders." *Hanly v. SEC,* 415 F.2d 589, 596 (2d Cir. 1969) (footnotes omitted); see *Commodity Fu-*

*tures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 916 & n. 18 (S.D.N.Y.1977) (relying on *Hanly* principle and citing cases).

**41.** Exh. 3.

**42.** See *Kelley v. Carr,* 442 F.Supp. 346, 356 (W.D.Mich.1977) ("inherently fraudulent for an organization . . . to make bold predictions of astronomical returns on investment in a field as speculative and uncertain as commodity options"); T.R. at 184–85 (Blitzer testimony on "outlandish" and unreasonable predictions about gold prices).

**43.** Investors were misled by "unsupported and unreasonable predictions [that] unmistakably implied the near-certainty of sizeable and immediate returns," *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 77 Civ. 1822 (LPG), slip op. at 12 (S.D.N.Y. Aug. 31, 1978), as well as by " 'a failure to disclose information,' " *Commodity Futures Trading Comm'n v. J. S. Love & Assocs. Options, Ltd.,* 422 F.Supp. 652, 659 (S.D. N.Y.1976) (quoting 40 Fed.Reg. at 26505 n. 1). These are material misrepresentations and omissions that constitute fraudulent conduct prohibited by Rule 32.9. *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911 (S.D.N.Y.1977).

the investor with phone calls urging speedy investment in the specie market. Indeed, in at least two instances, witnesses testified that defendant Droge tried to force a hasty decision on them by representing that, without their consent, he had already purchased gold for their accounts. The testimony abounds with unqualified promises of profit—" 'The way this is moving it is almost impossible for you to lose' " or "[Droge] did not indicate any risks. He indicated that with inflation and with the world as it is today, that [gold] was probably one of the most solid investments one could make. No, he made no mention of risks." [44] Because of the volatile nature of the world specie market and the fact that the price would have to rise above a break even point to cover the contango fee before customers would make a real profit, such statements were materially misleading to investors, particularly those who, like the witnesses before the Court, had never invested in commodities before and were not knowledgeable in the nature of the trade. [45]

■ Other material misrepresentations were made by MDC salesmen to overcome certain customer objections and to induce them to invest in specie: (1) that a performance bond issued by Vehicle Insurance Co. guaranteed the investments of MDC's buyers, a blatant and outright fraud, since the purported bond had never been issued by that company and was entirely fraudulent; (2) that MDC made its profits by buying gold and silver wholesale and selling it retail, when in fact profits were made by charging the sizeable contango fees (several of the purchasers testified that they were not informed that the contango fee was nonrefundable and that the firm charged any commission on the sales); and (3) that the officers of MDC were "reputable businessmen" experienced in the commodities trade. No mention was made to customers

that defendant Keats was convicted of fraud in the State of California, defendant Rodman had been convicted of stock fraud and defendant Morse enjoined civilly from violating the antifraud and registration requirements of the Commodity Act in another matter. One witness testified that, in response to a direct inquiry as to the backgrounds of the principals of MDC, defendant Droge explicitly represented to him that the principals of MDC were reputable businessmen. Droge denied he was aware of their past activities or criminal records. In view of his extensive relationship with them, particularly since Rodman was sentenced for securities fraud in this District on October 31, 1978, during the course of operations of MDC, this testimony is of doubtful value; [46] more importantly, even if, in fact, he had not known of their past illicit conduct, his endorsement of them as "reputable businessmen" was reckless and fraudulent. [47]

The written materials sent to customers by MDC—the Customer Agreement and the Gold Brochure—did not cure or correct the misrepresentations made by the salespeople. It is true that the Customer Agreement describes the option arrangement and its risks, but Rule 32.5(a) requires such written disclosure "prior to the entry into a commodity option transaction." In this case the unrebutted testimony is that customers did not receive the Agreement until *after* they had agreed to buy options and had paid for their purchases. [48] Defendants note that there is a form attached to the Agreement, which the customer was to sign so as to admit that he or she understood the risks of the investment, found it suitable for his or her financial objectives, and did not rely on sales statements contrary to the Customer Agreement. However, there is no evidence that customers actually signed the waiver, nor should they have been expected

---

**44.** T.R. at 115, 22.

**45.** *See* notes 40, 42, 43 *supra.*

**46.** *Dyer v. MacDougall,* 201 F.2d 265 (2d Cir. 1952) (L. Hand, J.).

**47.** Thus, "a salesman cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant." *Hanly v. SEC,* 415 F.2d 589, 596 (2d Cir. 1969).

**48.** T.R. at 27–28, 34, 62–63, 76, 85, 89, 107–09.

to do so after their money had already been forwarded. The waiver of various claims would not be valid in any event because of its adhesive character,[49] and the caveat on the front page of the Agreement (going to the riskiness of the investment) does not conform to the language mandated by Rule 32.5(a)(5) nor to the Rule's requirement that the caveat be printed "conspicuously" with boldface capital letters.[50] It is not blinking the fact to suggest that these clauses were an attempt at advance exoneration of contemplated fraudulent conduct.

After a customer had purchased an option, MDC agents sought to prevent him or her from cashing in on the account. Sometimes this would be effected by glowing statements that gold was expected to rise in the future and withdrawal at the time would forego imminent gains. Salespersons also sought to "load" customers with further options without regard to their suitability in light of the buyer's financial situation and to "roll" investors by pressuring them to reinvest all or a portion of their gains from profitable transactions, again without regard to suitability. One customer, a young physician with little money to invest, put up $1600 for a gold option, made a profit of $1080, and was strongly urged to continue buying until he had a total of over $10,000 invested in bullion. Indeed, there is no credible evidence that the salespeople of MDC ever made serious inquiry into the potential customer's financial background and his investment needs, except to ply him or her with more gold options.

In sum, the evidence establishes that the defendants, knowingly and purposefully, conducted a boiler room operation calculated to sell as large a volume of options as possible to customers throughout the country without regard to the suitability of the

investment for the customers, the soundness of the investments, or the accuracy and completeness of representations made to induce purchases. Each of the defendants promoted, aided and abetted, or participated in the operation of the boiler room. The Commission has abundantly established willful violations of the antifraud and disclosure rules promulgated under the Commodity Act.

### III

Section 6c of the Commodity Act provides that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted" against "any . . . person [who] has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of [the] chapter or any rule, regulation or order thereunder."[51] The Court earlier granted a preliminary injunction against the defendants and appointed an equity receiver for the corporation. The latter was consented to during the trial and indeed was urged by counsel for MDC and its President, Richard Keats, when it appeared various persons charging fraudulent conduct to one or more defendants attached assets of MDC upon the commencement of their actions. At issue is whether the injunction should be made permanent.

Courts have granted injunctive relief to the CFTC under the same standards that such relief would be afforded the SEC; that is, "the district court has broad discretion to enjoin possible future violations of the securities laws when past violations have been shown . . . .. The critical question in determining whether the public interest requires the imposition of a permanent injunction is 'whether there is a reasonable likelihood that the wrong will be

49. "An adhesive term is one that is attached to the main agreement, usually by means of a standard form contract, and that negates the apparent meaning of other contractual terms." These "[a]dhesive terms are . . . voided by the courts because they create . . . dangers of unfair surprise or of oppression."

Note, *Fairness, Flexibility, and the Waiver of Remedial Rights by Contract*, 87 Yale L.J. 1057, 1071–72 (1978) (citing cases).

50. 17 C.F.R. § 32.5(a)(5).

51. 7 U.S.C. § 13a–1.

repeated.' " [52] The Court has considered the defendants' continuous and systematic violations of the law, their continued insistence on their innocence, and the reckless or intentional nature of the violations and finds a permanent injunction appropriate in this case.[53]

As to the corporation and its President, the Court has little doubt that a permanent injunction is necessary because of the pervasive illegality of the firm's operations. The systematic past conduct of the company—the well–planned boiler room set-up, the calculated campaign of cold canvassing, the slanted and misleading brochures, the nonexistent performance bond, extravagant promises made by salespeople and encouraged by the company's management, and the patent illegality of the vehicle sold, together with the disingenuous attempt to cloak its true character—alone would warrant injunctive relief in this case.[54] Additionally, the Court finds that Keats himself acted with scienter in violat-

ing the Commodity Act.[55] For example, there was testimony that he engaged the law firm of November & November to merge MDC with another company, headed by defendant Rodman, in a blatant effort to evade CFTC regulation. And Lewyckyj, counsel for MDC, stated that Keats misled him with respect to the firm's activities and Keats' own previous conviction of fraud. Defendant Keats knew what the law required, yet supervised an operation that mocked the existence of the Act and the Commission. Finally, Keats' refusal to testify permits an inference of knowingly wrongful conduct centering about the charges brought by the CFTC.[56] His current violation of the Commodity Act, when considered together with his prior criminal conduct, suggests an attitude of utter disrespect of law.

The three remaining defendants—Droge, Rodman and Morse—contend that they were not responsible for whatever violations of law MDC engaged in; they were, it

**52.** *SEC v. Aaron,* No. 77–6091 (2d Cir. March 12, 1979) (quoting *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972)); *accord, Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211 (7th Cir. 1979); *petition for cert. filed,* ---- U.S. ·--- --, 99 S.Ct. 2848, -- - L.Ed.2d —— (1979); *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 560 F.2d 135, 141 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed. 2d 297 (1977); *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 918- 19 (S.D.N.Y.1977).

**53.** *SEC v. Universal Major Indus. Corp.,* 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied sub nom. Homans v. SEC,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977) (listing factors court may consider on issue of permanent injunction); *see Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 560 F.2d 135, 142 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 77 Civ. 1822 (LPG), slip op. at 18- 19 (S.D.N.Y. Aug. 31, 1978).

**54.** *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 920 (S.D.N.Y.1977) (injunction appropriate where there has been "pervasive wrongdoing over an extended period"); *see Commodity Futures Trading Comm'n v. Hunt,*

591 F.2d 1211, 1220 (7th Cir. 1979), *petition for cert. filed,* —— U.S. ·---—, 99 S.Ct. 2848, —— L.Ed.2d —— (1979) (when violation founded upon "systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct"); *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 560 F.2d 135, 142 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977) ("A likelihood of future violations may be inferred from past unlawful conduct.").

**55.** While it is clear that the CFTC need not prove scienter to establish that the defendant violated the law, "the court's findings that [defendant] acted with scienter underscore the need for an injunction." *SEC v. Aaron,* No. 77–6091 (2d Cir. March 12, 1979); *see* 40 Fed. Reg. 26504, 26505 n. 2 (Je. 24, 1975) (violation of CFTC rules not requiring "willful behavior").

**56.** *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *see Arthurs v. Stern,* 560 F.2d 477, 478 (1st Cir.), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1977); *United States ex rel. Carbone v. Manson,* 447 F.Supp. 611, 621 n. 5 (D.Conn. 1978) (dictum); *Paynes v. Lee,* 362 F.Supp. 797, 799 (N.D.La.1973), *aff'd,* 487 F.2d 1307 (5th Cir. 1974).

is claimed, small fry whose careers should not be ruined based on their incidental participation in the enterprise. The evidence is to the contrary. There was a plethora of proof that Droge consistently pressured and misled investors to buy options in gold or silver, this apart from his misrepresentation as to the good standing of the principals of MDC; because Rodman and Morse "exercised managerial and supervisory authority over the firm, [they were] equally responsible for the fraudulent representations made by the firm's salesmen." [57] Moreover, all three have been involved in questionable commodities firms in the past—for example, before their association with MDC they were employed by J. M. King & Associates, enjoined by this Court from defrauding the public in commodities deals [58]—and evince no recognition that they have committed any misdeed.[59] The permanent injunction should run against each of them to put a stop to their unrepentant fraud on the public.

 In addition to issuing a permanent injunction, section 6c of the Act allows the Court to fashion appropriate ancillary relief.[60] The Court is persuaded at this time that it should also order a disgorgement of profits from the defendants, who must be deprived of the fruits of their illegal conduct. To permit them to retain even a portion of their illicit profits "would impair the full impact of the deterrent force that is essential if adequate enforcement of [the Act] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom." [61]

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit judgment accordingly.

---

57. *SEC v. Aaron,* No. 77–6091 (2d Cir. March 12, 1979).

58. *See* note 33 *supra.*

59. *Compare SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18–19 (2d Cir. 1977) (denying injunction based in part on defendant's sincere remorse) *with SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1101 (2d Cir. 1972) (granting injunction based in part on defendants' continued insistence that their conduct was blameless).

60. *Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211 (7th Cir. 1979), *petition for cert. filed,* —--- U.S. --, 99 S.Ct. 2848, ---- L.Ed.2d - - (1979); *Commodity Futures Trad-* ing *Comm'n v. British American Commodity Options Corp.,* 77 Civ. 1822 (LPG) (S.D.N.Y. Aug. 31, 1978) (citing cases).

61. *SEC v. Golconda Mining Co.,* 327 F.Supp. 257, 259–60 (S.D.N.Y.1974); *see Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211 (7th Cir. 1979), *petition for cert. filed,* —— U.S. ——, 99 S.Ct. 2848, —— L.Ed.2d —— (1979); *SEC v. Commonwealth Chem. Securities, Inc.,* 574 F.2d 90, 102 (2d Cir. 1978); *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971).